# Attachment 1

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | C.A. No.: 2017-CP-_____ |
| COUNTY OF GREENVILLE | ) | |
| | ) | |
| Savanah Nabors, | ) | |
| | ) | |
| Plaintiff, | ) | SUMMONS |
| | ) | (Jury Trial Demanded) |
| vs. | ) | |
| | ) | |
| Sheriff Will Lewis, Greenville County | ) | |
| Sheriff's Office, County of Greenville, | ) | |
| South Carolina, Joseph Kernell, John Does. | ) | |
| | ) | |
| Defendants. | ) | |

TO:    THE DEFENDANTS NAMED ABOVE:

You are hereby summoned and required to answer the Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your answer upon the subscribers at their office at White, Davis & White Law Firm, P.A., Anderson, South Carolina, 29621, within thirty (30) days after the service hereof, exclusive of the date of such service. If you fail to answer the complaint within that time aforesaid, judgment by default will be rendered against you for the relief demanded in the complaint.

Respectfully submitted,

October 16, 2017

/s/Kyle J. White_____
Druanne D. White (S.C. Bar No. 5991)
Kyle J. White, (S.C. Bar No. 101426)
White, Davis, and White Law Firm
209 E. Calhoun St.
Anderson, SC 29621
(864) 231-8090
druanne@wdwlawfirm.com
kyle@wdwlawfirm.com

Attorneys for the Plaintiff

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Lauren Taylor (S.C. Bar No. 100417)
Lauren Taylor Law
1205 E Washington St.
Greenville, SC 29601

Attorney for the Plaintiff

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | IN THE COURT OF COMMON PLEAS |
| ) | C.A. No.:  2017-CP-_____ |
| COUNTY OF GREENVILLE ) | |
| ) | |
| Savanah Nabors, ) | |
| ) | |
| Plaintiff, ) | VERIFIED COMPLAINT |
| ) | (Jury Trial Demanded) |
| vs. ) | |
| ) | |
| Sherriff Will Lewis, Greenville County ) | |
| Sherriff's Office, County of Greenville, ) | |
| South Carolina, Joseph Kernell, John Does. ) | |
| ) | |
| Defendants. | |

The Plaintiff, complaining of the Defendants would respectfully show unto the Court as follows:

1.    Defendants County of Greenville, SC ("Greenville County") and Greenville County Sherriff's Office ("Greenville County SO") are political subdivisions of the State of South Carolina as defined in § 15-78-10 *et seq.* of the Code of Laws of South Carolina.  At all times herein mentioned, Greenville County and Greenville County SO acted and carried on their business by and through their agents, servants, and/or employees at various locations within the County of Greenville, South Carolina.  Additionally, these agents, servants, and/or employees were operating within the scope of their officially assigned and/or compensated duties.

2.    Sherriff Will Lewis ("the Sherriff"), sued in his individual and official capacity (hereinafter "the Sherriff"), at all times was a resident of Greenville County, South Carolina.  At all times relevant to this action, the Sherriff was a duly appointed and acting officer and employee of Defendants Greenville County and Greenville County SO.  As such, the Sherriff was a duly appointed agent authorized to enforce the laws under the State of South Carolina, and was so acting under the color of the law of South Carolina at all times relevant herein.   Upon information and

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

belief, the Sherriff is the final policymaker for Greenville County with regard to the law enforcement-related policy decisions or actions described hereinbelow.

3.      Defendant Joseph Kernell is the County Administrator for Greenville County.  As County Administrator, Kernell is responsible for the day-to-day operation of Greenville County Government that employs more than 1,800 people.  He is accountable for carrying out the policies, directives, and legislative actions of County Council, and is responsible for the annual budget that exceeds $195 million.  Kernell is sued in his individual and official capacity, and at all relevant times was acting within the course and scope of his duties with Greenville County, and was acting under the color of state law.  Upon information and belief, Kernell is the final policymaker for Greenville County with regard to the policy decisions or actions described hereinbelow.

4.      Defendant John Does are employees of Greenville County and Greenville County SO, and they will be sued in their individual and official capacities.  At all relevant times, Defendant John Does were acting in the course and scope of their employment, and under the color of state law.

## JURISDICTION

5.      This action is brought pursuant to South Carolina Code §15-78-10 *et seq.*, more commonly known as the South Carolina Tort Claims Act, and 42 U.S.C. § 1983.  Jurisdiction is founded upon the above statutory provisions.

## SEXUAL HARASSMENT STATISTICS

6.      Notwithstanding the fact that most employers and companies have sexual harassment policies and procedures and provide sexual harassment training, there are thousands of sexual harassment claims filed with the Bureau of Labor Statistics annually in the United States.

2

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

7.     According to various studies, including a recent one performed by Harvard located at https://hbr.org/2016/10/why-we-fail-to-report-sexual-harassment, sexual harassment continues to be especially problematic for women in predominantly masculine industries.  75% of women who were interviewed in the study indicated that they had been sexually harassed at work.

8.     Another recent study, located at https://www.huffingtonpost.com/2015/02/19/1-in-3-women-sexually-harassed-work-cosmopolitan_n_6713814.html, found that while 1 in 3 women have been sexually harassed at work, 71% of women who have been sexually harassed never reported it.  According to the same study, a staggering 41% of women surveyed had encountered unwanted touching and sexual advances at work.  Additionally, witnesses to sexual harassment frequently fail to report sexual harassment.

9.     According to Harvard Business Review, there are three potential reasons why it can be difficult to speak up about sexual harassment, including: fear of retaliation, the bystander effect, and a masculine culture that permits sexual harassment.

10.     The Harvard study found that most of the women who failed to report sexual harassment failed to do so because of fear of retaliation by the harasser or the organization.  One of the potential drivers of this fear is that sexual harassment is often trivialized by organizations or results in hostility and retaliation against the victim.  Unfortunately, the more powerful the harasser, the greater the fear of retaliation for reporting.

11.     The bystander effect is another potential factor that causes sexual harassment to go unreported.  This means that others are less likely to help the victim of sexual harassment when others are present.  The bystander effect occurs for two reasons – diffusion of responsibility (feeling like the others present will do something) and social influence (if no one else intervenes to assist the victim, others feel like failing to intervene is correct).  The failure to intervene then

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

tells the victim that the behavior is condoned by the observers who failed to intervene, which discourages the victim from reporting.

12.    Finally, particularly for those in predominantly masculine industries such as law enforcement, men tend to use subjugation of women as a way to relate to other men and prove masculinity, while reinforcing the lower status of women. Women who want to be part of the higher status group will then play along with sexual harassment because they do not want to be further alienated from the high status group (the male coworkers. In other words, female victims of sexual harassment play along in order to be seen as "one of the guys."

13.    The Harvard study cited above explains that organizations can decrease sexual harassment in the organization and better encourage women to report sexual harassment by providing better training (e.g., training that targets the bystander effect), developing clearer HR and reporting systems, and assessing and improving the organization's culture. Due in part to the Defendants' failure to have these safeguards in place, the Plaintiff was the victim of sexual harassment and sexual assault, and despite that one or more of the named Defendants and their employees had actual knowledge of the sexual harassment and/or sexual assault, nothing was done to intervene or ensure that there were consequences for same.

14.    Taxpayers should also be concerned, as the Harvard study estimates that sexual harassment costs organizations $22,500.00 a year in lost productivity *for each employee affected*, among other negative consequences.

## **FACTUAL BACKGROUND**

15.    The following is a chronological summary of the sexual harassment, sexual assault, and violations of Civil Rights of which the Plaintiff fell victim.

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

16.    Prior to becoming elected Sherriff, the Sherriff was employed by Greenville County SO as a deputy.  Prior to becoming Sherriff, the Sherriff had a well-documented history of alleged sexual harassment of employees.  Greenville County and Greenville County SO were well-aware of this history prior to the Sherriff taking office.   The following links are publicly available information pertaining to prior incidents:

    a.    http://wspa.com/2016/06/20/campaign-mudslinging-gets-personal-in-race-for-greenville-county-sheriff/

    b.    http://www.foxcarolina.com/story/32263910/sheriff-loftis-will-lewis-spar-ahead-of-runoff-election

    c.    https://www.dropbox.com/sh/1t4z6xg66vz9p1f/AABw7U16LANyxXSIxKRYZVRNa?dl=0

17.    The Sherriff was elected Sherriff of Greenville County, South Carolina and hired the Plaintiff as his employee shortly thereafter.   The Plaintiff's job consisted of going everywhere the Sherriff went: all meetings, conferences, speeches, luncheons, officer shootings (in the middle of the night), murders, crime scenes, trainings, press conferences, and anywhere else the Sherriff went. The Sherriff's stated purpose of this arrangement was that he could have the Plaintiff there to record all of his meetings, and contribute outsider's perspective to law enforcement decision making. The Sherriff also wanted the Plaintiff to accompany him everywhere so that the Plaintiff could quote back to him things he said in previous meetings that were relevant to subsequent meetings.

18.    The sexual harassment began almost immediately after the Plaintiff began her employment, and increased in severity as time passed.  One of the earlier examples of sexual harassment occurred on December 20, 2016, the day after the Sherriff's private induction

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

ceremony at the Poinsett Club in Greenville, SC. The next day at work, the Sherriff said he wanted to talk to the Plaintiff privately. Someone was in the office that the Plaintiff shared with the Defendant, so the Sherriff pulled the Plaintiff into the office beside the normal office. He told the Plaintiff how "gorgeous" and "stunning" she had looked at the ceremony the night before in her dress. He said he wasn't trying to make the Plaintiff uncomfortable; he just wanted her to know. He went on to explain that the Plaintiff was exceeding his expectations for the position.

19.     Shortly thereafter, in early January 2017, the Sherriff gave the Plaintiff a new county car.  When the Plaintiff stated that she felt guilty about having a new car while some employees (even command staff) were driving cars with over 200,000 miles on them, he said it is just another perk of the Plaintiff's job: "The best gets the best."

20.     Shortly thereafter, on January 17, 2017, the Sherriff and the Plaintiff went to BMW for (what the Plaintiff was led to believe was a meeting). Another employee went to the event as well, but the Sherriff arranged for the other employee to drive separately, with the Plaintiff and Sherriff riding together, as was the Sherriff's policy. The "meeting" ended up being the BMW Performance Driving School. The Sherriff explained that this was a once in a lifetime experience and he wanted the Plaintiff to do it. He explained that he and the Plaintiff would be "partners," and would drive different BMW's at high speed on dangerous courses. Following the race, the Sherriff said he thought the Plaintiff's driving was "sexy" and that he was proud of the Plaintiff for giving it her all and getting out of her comfort zone.

21.     On February 3, 2017, on a day that the Sherriff knew the Plaintiff's then-husband was out of town for work, the Sherriff sent a text to the Plaintiff stating, "How is the Moscato and bachelor?"

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

22.     The Plaintiff separated from her husband on February 15, 2017, for reasons unrelated to the Defendant.  On February 16, 2017, the Plaintiff told the Sherriff that she was separating from her husband. The Sherriff subsequently asked for the Plaintiff to ride in his car with him to the Greenville Hospital (his dad was in the hospital and he was going to visit him) to explain what was going on. The Sherriff asked many specific, personal questions regarding the reasons for the separation. During the conversation, the Sherriff went into great detail about what a "great body" the Plaintiff had and suggested that the Plaintiff's husband was "stupid" for not fully appreciating same. The Sherriff indicated that if he was 22 again, he would be "all over that" because the Plaintiff was the "full package" - she wasn't just cute, she was smart and could carry on an intellectual conversation. The Sherriff also suggested he could put her in touch with some great divorce attorneys.

23.     On February 16, 2017, the Sherriff called the Plaintiff late in the evening, at approximately 9 p.m. The Sherriff indicated during the call that he had talked to the county administrator and a major in the sheriff's department and that they had decided it was time to go out of town for a meeting. The Sherriff said he wanted to bring the Plaintiff along and that the other employees thought it was a good idea. The Sherriff said that he and the Plaintiff needed to discuss the budget and present a plan to the county administrator, and that they could only really do this out of town, because they can't get any work done in the office. He asked if the Plaintiff would be comfortable going to Charlotte or Atlanta. The Plaintiff agreed, but indicated she did not have a preference. The Sherriff added that this could be a time for he and the Plaintiff to kick back, relax, throw a ball cap on and "put a few back" because no one would know who he was.

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

24.     At some point between Feb. 15th and March 7th, the Sherriff said, "Hey cutie" as the Plaintiff got in his SUV on one of the 2 a.m. calls on which he required the Plaintiff to accompany him.

25.     On February 25, 2017, the Plaintiff rode to Clemson, SC with the Sherriff for a speech. They met another law enforcement officer there, because the other law enforcement officer and the Sherriff were doing the speech together. The Sherriff told the other law enforcement officer that he needed to "get a Savanah," because that's how he got everywhere he needed to be and stayed on track. The Sherriff told the Plaintiff after the event that the other law enforcement officer leaned in and told the Sherriff that he "could not have a Savanah" because he would get himself in trouble. The Sherriff indicated to the Plaintiff later in the ride that he wasn't going to tell his wife the Plaintiff was going to on the upcoming trip to Charlotte. The Plaintiff asked him why, and told him that made her feel uncomfortable. The Sherriff said he just didn't want to argue with his wife for no reason at all, that there was just no reason to bring it up to her.

26.     Also during various trips in the car in February of 2017, the Sherriff would ask the Plaintiff personal and sexual questions about her husband, such as how often they had sex, whether the Plaintiff ever wore anything special for the husband, how long the sex would be, whether they used toys, and various other areas of inquiry into the specifics of the sexual relationship between her and the husband from which she was separated.   The Sherriff explained that he considered the Plaintiff to be his best friend, even though she was 20 years younger, and that he felt like he could talk to her about anything. During this same time frame, the Sherriff routinely made comments to the Plaintiff that made her uncomfortable, such as:

    a.     "You look really cute today"

    b.     "Those pants suit your figure"

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

     c.     "You've got a really cute figure."

     d.     "I can really tell you've been working out."

27.     The Sherriff scheduled the "out of town trip" for March 7, 2017 in Charlotte. Kernel approved the trip, and actually agreed to attend the trip, despite the knowledge that the Sherriff, who had a background of sexually inappropriate behavior with female employees, would be supplying alcohol to the Plaintiff and would have the opportunity to be alone with the Plaintiff after the heavy drinking event. On the day of the Charlotte trip, the Sherriff came to pick the Plaintiff up at her house to go to Charlotte. He did not let the Plaintiff know he was on the way to her house. He just showed up. The Plaintiff came to the door and let him in. The Sherriff asked to use the restroom. The Plaintiff pointed him in the direction of the spare bathroom (located right next to the master bedroom), but he spotted the master bedroom and entered. He said it was really nice and admired the Plaintiff's furniture and laughed about The Bachelorette being on the TV. The Sherriff subsequently insisted on helping the Plaintiff pack her belongings in the car and they left for Charlotte. On the ride to Charlotte, the Sherriff kept talking about how much he could not wait to just kick back and have a drink. He emphasized that he really wanted to get to Charlotte before everyone got there because he wanted it to just be he and the Plaintiff drinking for a little while. He said everyone else talks only about work and he did not want to talk about work. He felt like he could carry on a conversation with the Plaintiff that was not work-related. This was not the first time that the Sherriff had emphasized he wanted to drink alone with the Plaintiff. He had mentioned this on multiple different occasions prior to the trip. The actions of Kernel, the final policymaker for Greenville County regarding approval of out of town budget meetings, finally supplied the Sherriff the opportunity to drink alone with the Plaintiff.

9

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

28.     The Plaintiff and the Sherriff eventually arrived at the Hyatt Place House Hotel located at 435 E Trade St, Charlotte, NC 28202.  Upon arriving in Charlotte, at the valet, the Sherriff insisted on unloading the bags. The Sherriff put a large bottle of dark liquor in the Plaintiff's bag. When the Plaintiff asked why the Sherriff did this, he said he didn't want to carry it up in plain sight, since he was the Sherriff, that he would "come and get it later." The Plaintiff and the Sherriff subsequently went to their rooms to unpack.

29.     Shortly thereafter, the Plaintiff, the Sherriff, Kernel, and Major Marcus Davenport went to the hotel bar for a drink. The Sherriff supplied the Plaintiff with two drinks at the bar before others arrived.  After approximately 30 minutes, Kernel, an assistant county administrator, and another county administration official arrived. They sat with the Plaintiff and the Sherriff in the bar in the hotel lobby. Everyone had drinks and ordered appetizers. At this point, the Sherriff kept making fun of how the Plaintiff was "babysitting" her drinks, suggesting that she need to drink faster.  This was in plain view of all others in attendance, including Kernel.  Upon information and belief, the Sherriff did not pressure any of the other attendees to drink faster.

30.     Everyone, including the Sherriff and Kernel, then decided to go to an Irish pub because the hotel bar was closing around 11 p.m. Everyone then had two group shots of "cinnamon toast crunch." The Plaintiff had a water as well. Shortly thereafter, the Sherriff asked the Plaintiff to step outside with him. The Sherriff told the Plaintiff that he was going to ask Kernel the following day during the budget meeting for the Plaintiff to get a raise. The Plaintiff told him that she did not think she was deserving of a raise; that she believed the deputies needed it more than she did, and that she had only been working for a few months. He said he had already discussed it with members of command staff and that he thought the Plaintiff had worked her "ass off" and deserved it. When leaving the Irish pub, the Sherriff tried to lift the Plaintiff up and put her on his

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

shoulders in plain view of the other attendees. The Sherriff dropped the Plaintiff, and another employee of the Sheriff's office caught the Plaintiff, keeping her head from falling directly on concrete. The group headed back to the hotel.

31.    After everyone returned to the hotel, they got on the elevator to return to their rooms.  Each member of the group, including Kernell, exited the elevator prior to the Plaintiff, causing the Plaintiff and the Sherriff to be alone in the elevator.  When the Plaintiff was about to exit the elevator, the Sherriff told the Plaintiff that he needed to stop by the Plaintiff's room to get the liquor that he had placed in her bag earlier in the day. The Plaintiff agreed to allow him to come by the room to retrieve the liquor. When the Sherriff arrived at the Plaintiff's hotel room, he welcomed himself into the hotel room and went straight for the bag where the liquor was.  The Sherriff then poured two drinks of what appeared to be a brown liquor. The Plaintiff had a few sips of her drink, and she began to feel uncomfortable. The Plaintiff does not recall the Sherriff drinking any of the drink that he poured for himself.  The Plaintiff sat on the couch in the room. The Sherriff sat on the recliner, flipping through channels until he got to a sports channel. The Plaintiff put her feet (wearing Tom wedges) on the coffee table.

32.    The Sherriff then leaned over and started untying the Plaintiff's shoes. The Sherriff then walked over and sat beside the Plaintiff on the couch. The Sherriff subsequently put his arm around the Plaintiff. The Plaintiff got up, because this made her feel uncomfortable. The Sherriff got up as well and forcibly kissed the Plaintiff.  The Plaintiff specifically remembers telling him the Sherriff that this manner of physical contact was a bad idea. In a further attempt to stop the Sherriff's advances, the Plaintiff brought up the Sherriff's wife. The Sherriff went into a long explanation about his lack of intimacy at home.

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

33.     The Sherriff then took off his button-down shirt, exposing the white t-shirt underneath.  He then laid down on the bed and then went into detail about how long it had been since he had sex with his wife. The Sherriff told the Plaintiff that she needed to relax. The Plaintiff then began to slip in and out of consciousness.

34.     The Plaintiff originally could not recall anything before the following morning. However, she subsequently regained some memory of the event, and now remembers two parts of the subsequent events.  The Plaintiff remembers regaining consciousness when the Sherriff was on top of her, having sex with her. It took the Plaintiff a second to realize what was happening and she had no idea how long it had gone on. The Sherriff asked the Plaintiff if she was ready for him to "finish," and the Plaintiff said yes.   The Sherriff then giggled, making a joke about how long he could "last," and added that he was sure the Plaintiff was not used to that.  The Plaintiff then lost consciousness again.

35.     The Plaintiff's next memory is waking up at 5 am to find the Sherriff still in the Plaintiff's bed. The Sherriff suggested they should go to his room and sleep. The Plaintiff does not remember walking to the Sherriff's room, but her next memory was waking up to daylight in the Sherriff's room. The Sherriff then leaned over the chair in his living room area and asked the Plaintiff to come to him. The Plaintiff felt awkward, like a child. The Sherriff tried to kiss the Plaintiff and she turned her head, such that the Sherriff ended up kissing her cheek. The Sherriff said, "I just wanted to make sure we were alright." Without responding, the Plaintiff returned to her room.

36.     Upon returning to her room, the Plaintiff took a shower and laid down. The Plaintiff received a call from the Sherriff saying that he and the rest of the crew were going out for coffee.

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

The Plaintiff told the Sherriff she wanted to rest. She felt sick and tired. The Sherriff returned to the Plaintiff's room to retrieve his button-down shirt and to bring the Plaintiff coffee.

37.    The Plaintiff then joined the group for a business meeting in the lobby, which lasted an hour or so, and then the Plaintiff went to lunch with the group. The Plaintiff could not eat much at lunch because she felt sick. At that point, the Plaintiff was trying to remember everything she had drank. She blamed the sexual encounter with the Sherriff on herself. She could not believe that she did not do more to prevent it from happening. She then tried to forget that it happened. Upon further reflection, the Plaintiff realized that she had not consumed enough alcohol the night before to lose consciousness, leading her to believe that the liquor drink in her hotel room contained some kind of drug. Concerned about her reputation, her pending divorce action, losing her job, and retribution, the Plaintiff decided not to report what had happened the night before.

38.    At dinner that evening, the Sherriff began acting territorial over the Plaintiff in plain view of the other county employees at dinner, including Kernell. The Sherriff became visibly angry when another patron came up to the Plaintiff and asked for her number, and the Sherriff subsequently put his hand in the Plaintiff's back pocket. The Plaintiff was uncomfortable, but she wasn't sure what to say or how to react, and the other county employees in attendance, including Kernell, did not do anything to intervene. The group all went out for drinks after dinner, and the Plaintiff joined them, because she was under the impression that she was required to do so as part of her job.

39.    On the walk back to the hotel, the Sherriff pulled a bottle of lubricant out of his back pocket. Apparently, the Sherriff developed the impression that lubricant was needed for any future sexual activity based on the previous night's sexual intercourse, which suggests that the Plaintiff was indeed unconscious during the sexual intercourse. The Sherriff then asked, "My room

13

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

or yours?" The Plaintiff then laughed nervously, brushed him off, and said "neither." The Sherriff persisted, asking the Plaintiff to at least step up to his room and talk about it. Since the Plaintiff continued to be in fear of losing her job, among other negative consequences of rejecting the Sherriff, the Plaintiff complied and stepped into his room.

40.      Upon arriving at the room, the Plaintiff explained that she did not want any part of whatever he was trying to do.  She explained that she did not remember much of the night before, but that when she looked at herself in the mirror that morning, she was not happy. The Sherriff said that the Plaintiff was being irrational, and thinking too much into it. The Sherriff said that the Plaintiff overanalyzes everything. He then began cussing and getting visibly frustrated, at which point the Plaintiff immediately left the room. The Sherriff (wearing no shoes) chased the Plaintiff into the elevator. The Plaintiff told the Sherriff to leave her alone. The Plaintiff went to her hotel room.  After falling asleep, the Plaintiff awoke to a phone call from the Sherriff asking her to open her hotel room door, and she did as instructed. The Sherriff asked if he could come in to apologize. The Plaintiff told him that she was tired, but let him in as requested.

41.      The Plaintiff sat on the end of the bed (with her feet on the floor). The Sherriff was standing where the living room and bedroom met. The Sherriff dramatically put his hands up in the air and announced, "Hands off. I swear to God I won't touch you. Just let me stay." The Sherriff explained that he was sorry and that he always screws everything in his life up. He said no matter what he fails at everything. He said sooner or later he would fail at being a Sheriff. The Sherriff then asked to stay the night, but the Plaintiff said no.  The Sherriff persisted, and despite being uncomfortable, the Plaintiff complied on the condition that the Sherriff was not allowed to touch her in any way.   The Sherriff had convinced the Plaintiff that he was sorry and that there would

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

be no further sexual advances. The Sherriff convinced the Plaintiff to let him sleep on the other side of the bed.

42.     The following morning, March 9, 2017, the Plaintiff woke up in the hotel room bed to the Sherriff's fingers inside the Plaintiff, despite the promise that he would not touch the Plaintiff again. The Plaintiff said, "See, this is why I didn't want you to stay the night." The Sherriff giggled and continued to sexually assault the Plaintiff.  The Plaintiff did not physically or verbally reject the Sherriff this time like she had the previous night, but the insertion of his fingers was certainly not consensual and she didn't know what else to do in that moment. The Plaintiff was the Sherriff's subordinate, the Sherriff was physically and politically more powerful than the Plaintiff. After the Sherriff was done, he left.  The Plaintiff showered, feeling violated and disgusted.

43.     Shortly thereafter, the Sherriff instructed the Plaintiff to go to breakfast (maybe around 9 a.m.) with him and another employee. The Plaintiff ordered a plate of food, but could not eat anything because she was sick to her stomach. After eating, everyone packed and headed back to South Carolina, with the Plaintiff being forced to ride home with the Defendant.  The car ride was awkward, but the Plaintiff and the Sherriff did not speak much. The Sherriff took business calls. At one point, the Sherriff warned, "What happens in Charlotte, stays in Charlotte." The Plaintiff laughed it off as a self-preservation mechanism.

44.     Over the course of the several days in March 2017, the Sherriff brought up the first night in Charlotte, and each time the Plaintiff would respond that she did not remember that much of it. The Sherriff said he was a little offended, but that the Plaintiff did have a lot to drink that night. The Sherriff brought up comments that the Plaintiff had apparently made during the sexual incident like, "I feel like I'm not doing my job." The Sherriff assumed the comment related to the

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Sherriff "lasting so long." Each time the Plaintiff responded that she did not remember much from that night. The Sherriff responded that it was one of the best nights of his life.

45.    The Plaintiff had not fully processed what happened, and she really wanted to keep her job, so she thought best to try to pretend like the previous events never happened and to insist on a strictly professional relationship.  For a period of time, the Plaintiff and the Sherriff began to work well together again, professionally, without the awkwardness, because at the Plaintiff's insistence, the Sherriff stopped bringing Charlotte up. In part, this was because the Plaintiff gave the Sherriff an out by allowing the Sherriff the excuse of him being extremely drunk.

46.    On Wednesday, March 22, 2017, the Plaintiff attended a campaign event at the Carolina Ale House to increase funding in the Sherriff's campaign account.  The Plaintiff and the Sherriff rode together to the event at the Sherriff's insistence.  At the event, the Sherriff attempted to pressure the Plaintiff into drinking faster and more.  The Sherriff ordered the Plaintiff two glasses of wine after the Plaintiff said she was done drinking because she had to drive home. The Plaintiff and the Sherriff then got in the car to leave. When the Plaintiff refused to go anywhere else with the Sherriff and told him to go home to his wife, the Sherriff became extremely angry.

47.    The following day, Thursday, March 23, 2017, the Sherriff then began treating the Plaintiff terribly at work. The Plaintiff's coworkers began asking what she did to make the Sherriff so mad, because he did not start acting rudely and angrily until the Plaintiff arrived at work.  The Sherriff informed the Plaintiff that she would be spending more time at the office, which was important because she took the job because it did not involve sitting the in the office all day.  This mistreatment and retaliation continued for the next several weeks.  For example, the Plaintiff was asked to stay late to work until 10 or 11 p.m., because the Sherriff's office was on standby due to a storm. When the Plaintiff asked for the Sherriff's permission to go home, he said "you're a grown

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

ass woman you can go home whenever you want to go home." This comment was made in front of a coworker, and the coworker asked if he needed to leave the room. That same week, the Sherriff threatened the Plaintiff that if she didn't start "letting him into every area of her life," and "being 100 percent honest about everything," that the Plaintiff would need to be replaced, because he needed a "best friend" that he could talk to about absolutely everything, and he needed that to be mutual. He needed trust.

48.     On March 28, 2017, the Plaintiff was home sick with the flu. The Sherriff knew that the Plaintiff had been to the county doctor the day before. The county doctor had diagnosed the Plaintiff with bronchitis, but the Plaintiff called her the morning of the 28th and told her the Plaintiff had been running a 104-degree fever. The county doctor then told the Plaintiff that she definitely had the flu, so the Plaintiff called to tell the Sherriff that she would not be in to work. The Sherriff said he wanted to stop by and check on the Plaintiff, but she asked him not to do that and said that she would be fine. The Sherriff came to the Plaintiff's house anyway. The Sherriff arrived at the Plaintiff's home with a bag of groceries and asked to be let in, so the Plaintiff complied.  The Sherriff began to discuss how bad things had been lately. He told the Plaintiff he was sorry, but he did not understand why the Plaintiff had been acting so stand offish.  The Plaintiff made up something about having trust issue, and the Sherriff responded angrily and said something hurtful. The Plaintiff cannot remember exactly what the Sherriff said, but it was something about how cold-hearted she was. The Plaintiff began to cry and asked the Sherriff to leave.  The Sherriff walked out, but only for a minute. He came right back in. He came to the couch and hugged the Plaintiff. He said, "You never cry. I must have really hurt you. I am so sorry." The Plaintiff explained that she just wanted things to go back to the way they were supposed to be, with everything being friendly, professional, and not physical. The Sherriff said he was not sure if things

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

would ever be the same, because Charlotte brought up feelings that he though he never had. He said he was trying to process them. He said he would try his best to treat the Plaintiff better at work. He unloaded the groceries in the kitchen. The Plaintiff tried to stay in the kitchen, but the Sherriff picked the Plaintiff up and carried her to the bed and said, "Let's get you to bed." The Plaintiff pretended to be tired so that the Sherriff would leave. The Sherriff kissed the Plaintiff on the forehead and tucked her in. The Sherriff tried to come back over that night and the day after. To prevent this from happening, the Plaintiff had to lie and tell him her mom was over making dinner, and that the Plaintiff's husband had stopped by to pack his things. The Plaintiff feared what would happen if the Sherriff returned to her home, but at the same time, she feared what would happen if the Sherriff felt rejected.

49.    In April 2017, a promotional video of employees working out at Paris Mountain was scheduled to be filmed.  The Plaintiff was supposed to ride to the event with another employee, but the Sherriff showed up to pick her up instead. The Plaintiff explained that she still had to change into her workout clothes for the video. The Sherriff said she could just change in his SUV when they got there, and that she could use the back because the windows were tinted. The Plaintiff did this, but she drove the SUV far away from everyone else to change because she was uncomfortable being anywhere close to the Sherriff when changing. When they left the event, the Sherriff asked the Plaintiff who she thought was the hottest guy in the sheriff's office. The Plaintiff would not answer. The Sherriff began listing off males in the office, and indicated that one of them (who it was obvious he felt threatened by) was not entirely heterosexual to dispel any notion that the Plaintiff should choose that employee.  The Sherriff concluded the conversation by warning that the Plaintiff was not allowed to date anyone from the Sheriff's Office.

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

50.    In April 2017, the Plaintiff obtained agreement from the Sherriff that the Sherriff would respect the Plaintiff's boundaries and that the relationship going forward would be strictly professional, appropriate, and friendly.  This occurred in the Sherriff's office, behind closed doors, after hours.  It was not unusual for the Sherriff to create reasons for the Plaintiff to have closed door meetings with the Sherriff after hours. Despite the agreement, at the end of the conversation, the Sherriff hugged the Plaintiff and kissed her on the forehead.

51.    On April 15, 2017, the Plaintiff went hiking with a friend from high school who was employed by another law enforcement agency. The Sherriff called the Plaintiff on her county phone, but the Plaintiff did not answer.  When the Plaintiff called the Sherriff later, the Sherriff questioned the Plaintiff about the hike. He warned that the Plaintiff should not start dating again, that she was not ready to start dating again. Feeling that she needed to explain herself in response to the inappropriate comments from her boss, the Plaintiff tried to explain that the hike was with a friend and it was not a date.

52.    On April 16, 2017, Easter, the Sherriff called the Plaintiff as she was in the parking garage about to meet her husband downtown. The Plaintiff told the Sherriff that she was with her mom and family because she knew he would be mad that she was out with her husband. The Sherriff began laughing strangely and said "okay, that's cool" as if he knew she was lying to him. The next day at work, the Sherriff said to the Plaintiff that he was so mad, and that he knew the Plaintiff had been lying because he "is good at what he does."  Upon information and belief, the Sherriff was able to use Greenville County SO resources to track the Plaintiff's activities.

53.    Later on in April of 2017, the Sherriff began prying even more into the Plaintiff's personal life and becoming even more territorial. If the Plaintiff was leaving the office before 7 p.m., the Sherriff would become visibly frustrated and wanted to know what the Plaintiff's plans

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

were and who the plans were with. When the Sherriff's wife and children were out of town, he expected the Plaintiff to work long night time shifts with him. When the Plaintiff told the Sherriff she would rather not be working all night on a Saturday night after working all week, the Sherriff would be offended and ask what her plans were. Shortly thereafter, the Sherriff required the Plaintiff to go with him after hours for ice-cream. The Sherriff said they deserved it. The Sherriff made the Plaintiff feed him some of her ice-cream with her spoon. The Plaintiff expressed that she thought this was awkward, and that anyone in public could see this and think it was inappropriate.

54.     Also in April of 2017, the Sherriff called the Plaintiff to his office to discuss the topic of the Plaintiff dating. The Sherriff asked to go through the Plaintiff's personal phone. The Plaintiff said no, and the Sherriff began to question why she would not let him go through her personal phone. The Plaintiff told him it was her business. The Sherriff warned that one day he would get into it, and that he didn't understand what she was trying to hide. The Plaintiff responded that she wasn't hiding anything, and that he could look through her county phone any time he wanted. The Sherriff reiterated that he didn't think the Plaintiff was ready to start dating again. The Sherriff went on to specifically say that he would be jealous if the Plaintiff dated anyone right now, because he was still trying to "work through those feelings". The Sherriff was upset that the Plaintiff had not shared her feelings with him. He expressed that he thought she was handling the situation a whole lot better than him, so she must not have those kinds of feelings for him. The Plaintiff said she does not like to talk about her feelings, and she likes for there to be a wall there, especially in the professional setting. The Sherriff said with the wall, there is no trust and that they needed to trust each other.

55.     On April 18, 2017, the Sherriff called the Plaintiff to tell her he wanted to come to her house to get a pressure washer. Not wanting to be alone at her house when he arrived, the

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Plaintiff left the house at around 7 p.m. and texted the Sherriff that the neighbors would let him in the garage to get the pressure washer.  The Plaintiff then went to Chick-Fil-A, ordered food, and sat in the Chick-Fil-A parking lot eating dinner. The Sherriff called again, and the Plaintiff told him to go ahead to her house, and that she was having dinner. Shortly thereafter, the Sherriff showed up behind the Plaintiff's car at Chick-Fil-A to follow the Plaintiff to her home. This was after 9 p.m.  The Plaintiff received a phone call from her sister at this time, and the Plaintiff indicated to her sister that her boss was following her.  The Plaintiff discussed with her sister that she was going to begin recording conversations with the Sherriff to obtain a record of the stalking in case something bad happened. The Plaintiff's sister did not know anything about the situation at this point, but she was worried based on the tone of the Plaintiff's voice, and said she was going to continue to call me until the Sherriff left. When they arrived at the Plaintiff's home, the Sherriff began to tell the Plaintiff that he intended to have the county pay for them to go to Reno for a conference.  The Sherriff explained that the county would pay for two airline tickets, but only one room, so he and the Plaintiff would need to share a room.  When the Plaintiff declined, the Sherriff became angry and stormed away from the house.  The following is a link to the ensuing recorded conversation regarding the proposed taxpayer-funded work-related trip to Reno: https://drive.google.com/open?id=0B9JQDr0ZfB3ZYWxxcWJaRnRqckU.                Additional recordings can be accessed at the following links:

     a.    https://drive.google.com/file/d/0B9JQDr0ZfB3ZSTl6TEJpU2RKSlE/view?usp=sharing

     b.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZYWxxcWJaRnRqckU

     c.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZUnRrRkdJaGtIZTQ

     d.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZdEhocktGWFB3akk

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

e.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZdTBSOVd2cjVzTlE

f.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZcWVDX0FVRnA5Rl
U

g.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZOU8ySzBmRnk2bWc

h.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZM0NBamRNTnBkUG
M

i.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZS1ktNHl4VHMtTms

j.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZZUt6aDVMRTF4R1k

k.    https://drive.google.com/open?id=0B9JQDr0ZfB3ZY0dUUVFpWWQtO
Tg

56.    The Plaintiff subsequently broke down.  She cried. She called her sister and filled her in on what had happened.  The Plaintiff explained to her sister that the Sherriff was acting obsessed, infatuated, and otherwise acting inappropriately, and that he was trying to get her to share a hotel room with him as part of a work trip to Reno. For the first time, the Plaintiff explained to her sister that the Sherriff had forced himself on her in Charlotte, but the Plaintiff did not divulge the extent of what happened.

57.    On April 19, 2017, the Plaintiff reported details of the inappropriate actions of the Sherriff to more than one employee of the Sherriff's Office, and played portions of recorded conversations with them.  The policy, procedure, and/or practice in place at the Sherriff's Office dictates that sexual harassment related complaints go to the Sherriff.  As a result, the Sherriff was almost immediately made aware of the Plaintiff's reports, and called the Plaintiff to discuss while she was on the way to Florida for a funeral.  When the Plaintiff would not commit to rekindling the "friendship" with the Defendant, the Sherriff began to suggest that the Plaintiff should no

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

longer work at the Sheriff's Office.  The Plaintiff was eventually told to put in her two weeks' notice.  The Plaintiff found out from coworkers that others at the Sheriff's Office and the county had been aware of the red flags that inappropriate things were happening for quite a while, and the Plaintiff also learned that other women had alleged in the past that the Sheriff had committed similar inappropriate acts.  Notwithstanding, no employees of Greenville County or Greenville County SO intervened to protect the Plaintiff at any point in time prior to her constructive termination.

58.     When the Sheriff learned that the Plaintiff intended to put in her two weeks' notice, which she did on April 24, 2017, the Sheriff instructed her to cease employment immediately as opposed to finishing out her two weeks.

59.     On April 25, 2017, the Sheriff called to beg the Plaintiff to come back, indicating that a raise for her had been approved by Kernel.  The Sheriff referenced rumors going around as to why she had left, and suggested that if she returned, it would stop the rumors.  The Sheriff said he would have someone bring her all of her county equipment back.  The Plaintiff said she would think about it to end the conversation, but she followed up with an email the next day asking the Sheriff to cease all contact with her.

60.     On May 2, 2017, the Plaintiff drove herself to Spartanburg Mental Health and waited for a walk-in appointment. When she saw the counselor, she disclosed (for the first time) that she had been sexually assaulted by her boss. The Plaintiff explained that she was having nightmares and couldn't sleep, and that she could not eat. The Plaintiff explained that she was generally miserable and needed help. The counselor referred to other medical providers for what appeared to be symptoms of post-traumatic stress disorder.  The Plaintiff then went in to one of the recommended facilities for an intake and disclosed mostly everything to the intake specialist

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

and manager, so that she could refer the Plaintiff to the appropriate counselor. The intake specialist indicated that she had a background in HR, and that the Plaintiff needed to go see an attorney. The Plaintiff went on to see a counselor, who provided treatment and prescribed medication. The Plaintiff continues to receive mental health treatment to this day.

## MITIGATION OF DAMAGES

61.    While the Plaintiff was offered her job back after the termination, if she were to accept reinstatement, it would make her subject to further victimization from one of the most powerful Greenville County and Greenville County SO officials, so she had no choice but to decline the offer of reinstatement.

62.    Accordingly, the Plaintiff attempted to mitigate her damages in other ways. She applied for numerous other positions, but she was unable to find another comparable job.

63.    The Plaintiff also attempted to publish a book regarding her account of what happened. This was an effort to mitigate her damages by earning income, and an effort to educate the public regarding a matter of important public interest. The Plaintiff wanted to inspire other women to come forward while mitigating her damages.

64.    In a further effort to mitigate her damages and educate the public on a matter of important public interest, the Plaintiff attempted to tell her story via a blog post on a website operated by her sister, located at www.jacksonpinefarm.com, which includes a blog section that allows victims of tragedies to speak up and let people know what they have been through. More information regarding the blog and the Plaintiff's sister can be accessed at http://www.insideedition.com/headlines/12519-how-a-devoted-wife-communicates-runs-business-with-her-quadriplegic-husband?viewfull=true. The Plaintiff did not mention the

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Sheriff's name in the blog post, but she provided some of the details of what transpired in an effort to inform the public of this matter of important public interest.

65.     The Plaintiff took down the blog post and abandoned the effort to mitigate her damages through the book idea under the fear that she would be sued for defamation, despite the fact that all of the information that she provided was true and was a matter of important public interest.

## FOR A FIRST CAUSE OF ACTION
### (South Carolina Payment of Wages Act)

66.     Plaintiff repeats the foregoing paragraphs as if repeated here, verbatim.

67.     At all times pertinent hereto, some or all of the Defendants were the "employer" of the Plaintiff as that term is defined in S.C. Code Ann. Sec. 41-10-10(1).

68.     Monies owed to the Plaintiff by the Defendants constitute "wages" as defined in S.C. Code Ann. Sec. 41-10-10(2).

69.     Despite the termination of her employment with the Defendants, the Plaintiff has not been paid all wages due within the time required by S.C. Code Ann. Sec. 41-10-50.

70.     The Defendants' refusal to pay any wages owed to the Plaintiff is unjustified and without excuse.

71.     Due to the Defendants' unjustifiable refusal to pay the Plaintiff her wages, the Plaintiff has been denied earned wages and is entitled to three times the unpaid amount pursuant to S.C. Code Ann. Sec. 41-10-80(c).

72.     Due to the actions of the Defendants in wrongfully refusing to pay the Plaintiff's earned wages, the Plaintiff has been forced to retain an attorney to represent her and is entitled to

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

the judgment of the Court pursuant to S.C. Code Ann. Sec. 41-10-80(c) requiring the Defendants to pay her reasonable attorney's fees as well as the costs incurred in the prosecution of this action.

73.     The Plaintiff is therefore informed and believes he is entitled to judgment against the defendants for statutory damages, treble damages, actual damages, costs, and reasonable attorney's fees.

## FOR A SECOND CAUSE OF ACTION
### (Wrongful and Retaliatory Discharge in Violation of Public Policy)

74.     The Plaintiff repeats the foregoing paragraphs as if repeated here, verbatim.

75.     The Defendants terminated the Plaintiff because of Plaintiff refused to tolerate sexual advances by the Sherriff.

76.     The termination of the Plaintiff violates public policy. Public policy mandates that an employee should not be forced to tolerate her superior's unwanted sexual advances and should not be physically attacked by her employer. Public policy further mandates that an employee such as the Plaintiff should not be fired for notifying her supervisor that she wishes to be left alone and not touched in a sexual manner. Public policy further mandates that employer respect employees' request to be allowed to work in an environment free from sexual harassment and unwanted sexual advances.

77.     The Defendants forced the Plaintiff to be subjected to and suffer from sexual assaults and/or advances, which violates public policy. The Plaintiff refused to engage in mutual flirting or a sexual relationship with the Defendants, and that refusal contributed to the Defendants' termination of the Plaintiff.

78.     The termination of the Plaintiff was in retaliation for the Plaintiff's actions/resistance/refusals protected by public policy.

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

79.     As a direct and proximate result of the Defendants' actions, the Plaintiff has been damaged.

80.     The Plaintiff is therefore informed and believes he is entitled to judgment against the Defendants for actual and punitive damages.

### FOR A THIRD CAUSE OF ACTION
**(Common Law – Gross Negligence, Negligence *per se* – Hiring, Training, Supervision, and Maintenance as to Greenville County and Greenville County SO)**

81.     Plaintiff further alleges that the Defendants are responsible for the conduct alleged herein resulting in harm to the Plaintiff, as well as the conduct of their agents, servants and/or employees acting within the course and scope of their employment, as set forth above; said conduct being grossly negligent, willful and reckless, including, among others, without limit:

a.     The failure to hire adequate and proper personnel;

b.     The failure to establish policy or practice that would lead to the discovery of mattress deprivation by its employees and prevent the same from occurring;

c.     The failure to establish policy or practice that would lead to the discovery of violent actions by its employees and prevent the same from occurring;

d.     The failure to make periodic and proper investigations and take remedial action as might be necessary to prevent inappropriate actions and similar activities from occurring at the location where the Plaintiff was harmed;

e.     The failure to perform a proper and adequate background check prior to employing the above-referenced officers;

f.     In employing and continuing to employ the above-referenced officers when it knew or should have known their propensity to improperly handle their duties;

g.     The failure to properly supervise their employees;

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

h.  The failure to properly determine and investigate complaints about and activities of the above-referenced officers;

i.  The failure to implement adequate security or safety measures designed to prevent or substantially reduce the likelihood that the Plaintiff or others similarly situated would be subjected to the acts of harassment, assault, and/or battery;

j.  The failure to provide necessary protection to the Plaintiff despite actual knowledge of specific risk of harm to her posed by the above described conduct and individuals;

k.  The failure to protect the Plaintiff from known risks of harm;

l.  The failure to use even slight care and caution in safekeeping the Plaintiff with whom they had a fiduciary duty;

m.  The failure to protect the Plaintiff from the above-referenced individuals, including Defendant Lewis;

n.  In creating an environment which subjected the Plaintiff to harassment, physical and mental harm;

o.  In creating an environment in which the above-referenced officers were permitted to prey on the vulnerability of those under their control;

p.  The failure to develop and disseminate a clear policy advising all employees that sexual harassment and/or sexual assault is a prohibited employment practice and one that would not be tolerated in a place of work;

q.  The failure to enforce policies prohibiting mistreatment of subordinate employees;

r.  The failure to have and/or implement special policies regarding the treatment of subordinate employees;

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

s.  The failure to train supervisors or other employees to recognize, investigate and properly remedy sexual harassment and/or sexual assault issues;

t.  The failure to properly train, monitor and supervise employees, to include and not be limited to Lewis and the officer who disregarded the specific and known risk of harm described above;

u.  The failure to maintain adequate security systems;

v.  The failure to maintain the Defendants' premises in a safe fashion;

w.  The failure to protect the Plaintiff from risk of harm after knowing of the assault against Plaintiff thereby placing her in fear of further harm; and

x.  For creating an unreasonably unsafe environment that allowed and caused the violent assault and sexual harassment to occur.

82.    The Plaintiff seeks damages against the Defendants for actual and consequential damages in an amount to be determined by a jury.

83.    As the above-described incidents involve numerous separate acts and/or omissions pertaining to the failure to train, supervise, and/or terminate the employment of numerous individuals who committed the acts and/or omissions, Plaintiff has alleged multiple "occurrences" pursuant to *Chastain v. Anmed Health Found.*, 388 S.C. 170 (2010) and *Boiter v. SCDOT*, 393 S.C. 123 (2011) for the purpose of calculating the applicable damages caps, if any.

## FOR A FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 Violation of Civil Rights as to the Sheriff)

84.    The above-referenced acts and/or omissions by the Sheriff occurred within the scope of his employment as the Sheriff of Greenville County and under the color of state law.

85.    The above-described acts and/or omissions of the Sheriff violated the Plaintiff's rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

86.     Any reasonable person would be aware that the above-described conduct violated the Plaintiff's civil rights.

87.     As a direct and proximate result of the Defendant's violation of the Plaintiff's civil rights, the Plaintiff has suffered damages, including mental anguish, bodily injury, pain and suffering, emotional distress, humiliation, embarrassment, loss of enjoyment of life, past and future medical care and treatment, loss of earnings, and loss of ability to earn money.  The issues are continuing and the Plaintiff will suffer losses in the future.  The Plaintiff also intends to seek reimbursement of attorney's fees and costs, as well as all available noneconomic and punitive damages.

88.     This Defendant is not entitled to qualified immunity under the current state of the law, and even if he was entitled to assert such a defense under the current state of law, qualified immunity is unlawful and should no longer be recognized as a defense to claims asserted under 42 U.S.C.A. § 1983. *See Ziglar v. Abbasi*, 26 Fla. L. Weekly Fed. S. 655 (U.S. 2017) (Thomas, J., concurring) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.") (citing Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. (forthcoming 2018) (manuscript, at 7-17), online at https://papers.ssrn.com/abstract=2896508 (as last visited June 15, 2017)).

89.     As a direct and proximate result of the unconstitutional conduct of this Defendant, the Plaintiff seeks, actual, compensatory, and punitive damages, as well as attorney's fees and costs.  Plaintiff also seeks all other available damages, including any noneconomic or economic damages available to him.

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

**FOR A FIFTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 Violation of Plaintiff's Civil Rights**
**as to Defendant Greenville County and Defendant Kernell)**

90.     At all times material hereto, Greenville County was responsible for the Greenville County SO, and specifically the Sherriff, as well as the Greenville County SO's agents and employees, including hiring, supervising, overseeing, training and establishing policies, customs, and procedures to conform their conduct to the applicable state and federal laws.

91.     The Sherriff was the final policy maker for Greenville County regarding law enforcement policies and acts, including Greenville County SO employment decisions. Additionally, Kernel was the final policymaker for Greenville County regarding approval of out of town trips, whether drinking would be allowed at out of town work trips, and as to how County funds could be used by the Sherriff for matters outside of standard law enforcement activities. Kernell and others at

92.     Kernell and other employees of Greenville County had actual knowledge of prior incidents involving the Sherriff allegedly sexually harassing women, including the Plaintiff, and took no steps to remove the Sherriff from office (despite the power to do so).  Kernell made the policy decision to have sexual harassment complaints pertaining to the Sherriff go to the Sherriff as opposed to someone other than the Sherriff, and Kernell chose not to implement an effective sexual harassment policy, procedure, and/or practice that would protect employees from victimization, and allow victims of sexual harassment to report same.  This effectively deprived the Plaintiff of the opportunity to report the above-referenced conduct to anyone and violated the Plaintiff's civil rights.

93.     Kernell also made the policy decision to approve the use of taxpayer dollars for the Charlotte trip, which involved heavy drinking, and otherwise furnished the opportunity for the

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

above-referenced harm to the Plaintiff.  Additionally, employees of the county who attended the Charlotte trip, had actual knowledge of one or more of the Sherriff's actions described above, and failed to intervene to prevent the inevitable harm to the Plaintiff.  This was in keeping with the policies, procedures, and/or practices in place at Greenville County and Greenville County SO.

94.    Greenville County's policies, procedures, customs, and practices of condoning unlawful and improper acts by their employees and Greenville County SO employees, of failing to identify, train, discipline, and otherwise properly supervise officers who have engaged in unlawful and unjustified acts, and specifically of condoning and failing to appropriately respond, through discipline, training, supervision, or otherwise, to the prior misconduct of the Sherriff were a moving force behind the violations of the Plaintiff's civil rights.

95.    Greenville County displayed deliberate indifference to the rights of the Plaintiff by allowing the Sherriff to possess law enforcement authority despite his prior history of abuse of women dating back to at least 2011.

96.    Greenville County displayed deliberate indifference to the rights of the Plaintiff by allowing the Sherriff to possess law enforcement authority after his propensity to abuse that authority became evident.

97.    Greenville County displayed deliberate indifference to the rights of the Plaintiff by allowing the Sherriff to possess law enforcement authority despite actual knowledge of the Sherriff's unconstitutional abuse of the Plaintiff.

98.    As a direct and proximate result of the violation of the Plaintiff's civil rights, the Plaintiff has suffered damages, including mental anguish, bodily injury, pain and suffering, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, expense of medical care and treatment, loss of earnings, loss of ability to earn money, and various other

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

categories of economic and noneconomic damages.  The Plaintiff also claims reimbursement of attorney's fees and costs pursuant to 42 U.S.C. Section 1988, as well as punitive damages.

99.     This Defendant is not entitled to qualified immunity under the current state of the law, and even if it was entitled to assert such a defense under the current state of law, qualified immunity is unlawful and should no longer be recognized as a defense to claims asserted under 42 U.S.C.A. § 1983. *See Ziglar v. Abbasi*, 26 Fla. L. Weekly Fed. S. 655 (U.S. 2017) (Thomas, J., concurring) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.") (citing Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. (forthcoming 2018) (manuscript, at 7-17), online at https://papers.ssrn.com/abstract=2896508 (as last visited June 15, 2017)).

**FOR A SIXTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 Violation of Plaintiff's Civil Rights**
**as to Defendants John Does)**

100.     At all times material hereto, various John Doe employees of Greenville County SO and Greenville County, to be sued in their individual and official capacities, were responsible for the Greenville County SO, and specifically the Sherriff, as well as the Greenville County SO's agents and employees, including hiring, supervising, overseeing, training and establishing policies, customs, and procedures to conform their conduct to the applicable state and federal laws.

101.     Various John Does Greenville County and Greenville County SO employees were the final policymakers for additional policy decisions pertaining to the Greenville County SO and Greenville County, and otherwise exercised control over those organizations.  Defendant John Does had actual knowledge of prior incidents involving the Sherriff allegedly sexually harassing women, and actual knowledge of the abuse of the Plaintiff, and took no steps to remove the Sherriff from office (despite the power to do so) or to protect the Plaintiff from further harm.  Defendant

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

John Does also made various policy decisions that violated the Plaintiff's Constitutional rights. This effectively deprived the Plaintiff of the opportunity to report the above-referenced conduct to anyone and violated the Plaintiff's civil rights.

102.    Defendant John Does condoned and enabled the unlawful and improper acts described above and failed to identify, train, discipline, and otherwise properly supervise officers who have engaged in unlawful and unjustified acts, and specifically of condoning and failing to appropriately respond, through discipline, training, supervision, or otherwise, to the prior misconduct of the Sherriff were a moving force behind the violations of the Plaintiff's civil rights.

103.    Defendant John Does displayed deliberate indifference to the rights of the Plaintiff by failing to protect the Plaintiff from the specific and known risk of harm posed by the Sherriff.

104.    As a direct and proximate result of the violation of the Plaintiff's civil rights, the Plaintiff has suffered damages, including mental anguish, bodily injury, pain and suffering, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, expense of medical care and treatment, loss of earnings, loss of ability to earn money, and various other categories of economic and noneconomic damages.  The Plaintiff also claims reimbursement of attorney's fees and costs pursuant to 42 U.S.C. Section 1988, as well as punitive damages.

105.    Defendant John Does are not entitled to qualified immunity under the current state of the law, and even if they were entitled to assert such a defense under the current state of law, qualified immunity is unlawful and should no longer be recognized as a defense to claims asserted under 42 U.S.C.A. § 1983. *See Ziglar v. Abbasi*, 26 Fla. L. Weekly Fed. S. 655 (U.S. 2017) (Thomas, J., concurring) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.") (citing Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. (forthcoming

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

2018) (manuscript, at 7-17), online at https://papers.ssrn.com/abstract=2896508 (as last visited June 15, 2017)).

106.    The Plaintiff specifically reserves the right to amend the complaint to substitute the real names of Defendant John Does as appropriate.

## FOR A SEVENTH CAUSE OF ACTION
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq.)

107.    The Plaintiff has filed an EEOC charge, and specifically reserves the right to amend her complaint to assert Title VII claims when she receives the right to sue letter.  The Plaintiff intends to seek all available damages as part of this claim.

## FOR AN EIGHTH CAUSE OF ACTION
### (Common Law Liability for Negligence, Gross Negligence, & Recklessness as to the Sherriff and Defendant John Does)

108.    The Plaintiff repeats the foregoing paragraphs as if repeated here, verbatim.

109.    This cause of action is asserted in the alternative, in the event that it is determined that any of the above-described conduct was outside of the scope of any of the referenced individuals' scope of work.

110.    The Defendants had a duty to avoid negligently causing the Plaintiff emotional distress, unnecessary expense, avoid defaming the plaintiff, take reasonable measures to keep the plaintiff safe from attacks by coworkers, take reasonable measures in hiring employees, avoid subjecting the plaintiff to known criminal activity of other employees and sexual harassment, avoid attacking the plaintiff, avoid entrusting property and space to employees known to use intoxicants, and other duties as will be shown through discovery and at trial.

111.    The defendants negligently and recklessly breached these duties to the plaintiff.

112.    As a result of Defendants' breaches, the Plaintiff has suffered some or all of the following injuries and damages;

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

a.     Physical manifestation of emotional distress;

b.     lost ability to earn wages;

c.     damage to her reputation;

d.     time and wages lost from her gainful employment;

e.     legal fees and expenses;

f.     termination from her job;

g.     physical pain and suffering;

h.     withheld wages;

i.     sexual assault and/or harassment; and,

j.     other damages as will be shown through discovery and at trial.

113.     The Plaintiff is therefore informed and believes that she is entitled to judgment against the Defendants for actual and punitive damages.

WHEREFORE, having fully set forth the grounds in her Complaint, Plaintiff asks the Court to award the following:

1.     Compensatory and punitive damages in an appropriate amount against the Defendants, jointly and severally;

2.     Statutory damages;

3.     Attorney's fees and costs;

4.     Such other and further relief as the Court may deem just and proper.

*(signature on following page)*

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Respectfully submitted,

October 16, 2017                     /s/Kyle J. White_____
                                    Druanne D. White (S.C. Bar No. 5991)
                                    Kyle J. White, (S.C. Bar No. 101426)
                                    White, Davis, and White Law Firm
                                    209 E. Calhoun St.
                                    Anderson, SC 29621
                                    (864) 231-8090
                                    druanne@wdwlawfirm.com
                                    kyle@wdwlawfirm.com

                                    Attorneys for the Plaintiff


                                    Lauren Taylor (S.C. Bar No. 100417)
                                    Lauren Taylor Law
                                    1205 E Washington St.
                                    Greenville, SC 29601

                                    Attorney for the Plaintiff


The Plaintiff demands a trial by jury.

/s/ Kyle J. White_____
Kyle J. White (SC Bar No. 101426)

ELECTRONICALLY FILED - 2017 Oct 16 4:55 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

**VERIFICATION**

Personally appeared before me, Savanah Nabors, who being duly sworn, deposes and says that she is the Plaintiff in the foregoing action, that she has read the within Complaint, and hereby certifies that the facts are true of her own knowledge, except any matters and things therein alleged upon information and belief, and as to those, she believes them to be true.

Savanah Nabors

SWORN TO BEFORE ME

This, the 16th of October, 2017

Notary Public for South Carolina

My Commission Expires on 8/28/25

Jessica Franquiz
Notary Public, State of South Carolina
My commission expires: August 28, 2025

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

| | |
|---|---|
| STATE OF SOUTH CAROLINA )<br><br>COUNTY OF GREENVILLE )<br><br>Savanah Nabors, )<br><br>            Plaintiff, )<br><br>        vs. )<br><br>Sheriff Will Lewis, Greenville County<br>Sheriff's Office, County of Greenville,<br>South Carolina, Joseph Kernell, John Does.<br><br>          Defendants. ) | IN THE COURT OF COMMON PLEAS<br><br>C.A. No.: 2017-CP-23-6553<br><br>AMENDED SUMMONS |

TO:    THE DEFENDANTS NAMED ABOVE:

       You are hereby summoned and required to answer the Amended Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your answer upon the subscribers at their office at White, Davis & White Law Firm, P.A., Anderson, South Carolina, 29621, within thirty (30) days after the service hereof, exclusive of the date of such service. If you fail to answer the Amended Complaint within that time aforesaid, judgment by default will be rendered against you for the relief demanded in the Amended Complaint.

       Respectfully submitted,

October 24, 2017

       /s/Kyle J. White_____
       Druanne D. White (S.C. Bar No. 5991)
       Kyle J. White, (S.C. Bar No. 101426)
       White, Davis, and White Law Firm
       209 E. Calhoun St.
       Anderson, SC 29621
       (864) 231-8090
       druanne@wdwlawfirm.com
       kyle@wdwlawfirm.com

       Attorneys for the Plaintiff

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Lauren Taylor (S.C. Bar No. 100417)
Lauren Taylor Law
1205 E Washington St.
Greenville, SC 29601

Attorney for the Plaintiff

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

STATE OF SOUTH CAROLINA    )    IN THE COURT OF COMMON PLEAS
                  )
COUNTY OF GREENVILLE    )
                  )
Savanah Nabors,    )    C.A. No.:  2017-CP-2017-CP-23-6553
                  )
        Plaintiff,    )    VERIFIED AMENDED COMPLAINT
                  )    (Jury Trial Demanded)
        vs.    )
                  )
Sheriff Will Lewis, Greenville County    )
Sherriff's Office, Joseph Kernell, County of    )
Greenville, South Carolina, John Does.    )
                  )
        Defendants.

The Plaintiff, complaining of the Defendants would respectfully show unto the Court as follows:

1.    During one of the last conversations the Plaintiff had with Defendant Sheriff Will Lewis ("the Sheriff") before she was terminated from her job, which occurred after the Plaintiff had made it clear to the Sheriff that she did not want to have a relationship with him beyond a professional one, the Sheriff explained to the Plaintiff that "I mean, ultimately, when you work for the Sheriff's Office, you work at the pleasure of the sheriff . . . . You work at the pleasure of the sheriff. I mean, that's just it. Period . . . "  Instead of bottling up the pain and continuing to allow the Sheriff to victimize her as a condition of keeping her job, the Plaintiff decided that her dignity and self-respect meant too much to her, and that she was not going to take the abuse and harassment any more. She was compelled to stand up for herself and for any other women in her position.  The Plaintiff was willing to take on this fight, despite the knowledge that the Defendants would predictably attempt to attack her credibility by painting her as promiscuous and otherwise undeserving of the right to say "no" to unwelcome sexual advances.  This lawsuit is a crucial part of the Plaintiff's effort to stand

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

up to her attacker and the others responsible for her injuries and damages described below.

2.      Plaintiff Savanah Nabors currently resides in Florida, but at all times described below, was a citizen and resident of South Carolina.

3.      Defendants County of Greenville, SC ("Greenville County") and Greenville County Sheriff's Office ("Greenville County SO") are political subdivisions of the State of South Carolina as defined in § 15-78-10 *et seq.* of the Code of Laws of South Carolina. At all times herein mentioned, Greenville County and Greenville County SO acted and carried on their business by and through their agents, servants, and/or employees at various locations within the County of Greenville, South Carolina.  Additionally, these agents, servants, and/or employees were operating within the scope of their officially assigned and/or compensated duties.

4.      Sheriff Will Lewis, sued in his individual and official capacity (hereinafter "the Sheriff"), at all times was a resident of Greenville County, South Carolina. At all times relevant to this action, the Sheriff was a duly appointed and acting officer and employee of Defendants Greenville County and Greenville County SO. As such, the Sheriff was a duly appointed agent authorized to enforce the laws under the State of South Carolina, and was so acting under the color of the law of South Carolina at all times relevant herein.    Upon information and belief, the Sheriff is the final policymaker for Greenville County with regard to the law enforcement-related policy decisions or actions described hereinbelow.

5.      Defendant Joseph Kernell is the County Administrator for Greenville County. As County Administrator, Kernell is responsible for the day-to-day operation of Greenville County Government that employs more than 1,800 people. He is accountable for carrying out the policies, directives, and legislative actions of County Council, and is responsible for the annual budget that exceeds $195 million. Kernell is sued in his individual and official

4

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

capacity, and at all relevant times was acting within the course and scope of his duties with Greenville County, and was acting under the color of state law. Upon information and belief, Kernell is the final policymaker for Greenville County with regard to the policy decisions or actions described hereinbelow.

6.     Defendant John Does are employees of Greenville County and Greenville County SO, and they will be sued in their individual and official capacities. At all relevant times, Defendant John Does were acting in the course and scope of their employment, and under the color of state law.

## JURISDICTION

7.     This action is brought pursuant to South Carolina Code §15-78-10 et seq., more commonly known as the South Carolina Tort Claims Act, and 42 U.S.C. § 1983. Jurisdiction is founded upon the above statutory provisions.

## SEXUAL HARASSMENT STATISTICS

8.     Notwithstanding the fact that most employers and companies have sexual harassment policies and procedures and provide sexual harassment training, there are thousands of sexual harassment claims filed with the Bureau of Labor Statistics annually in the United States.

9.     According to various studies, including a recent one performed by Harvard located at https://hbr.org/2016/10/why-we-fail-to-report-sexual-harassment, sexual harassment continues to be especially problematic for women in predominantly masculine industries. 75% of women who were interviewed in the study indicated that they had been sexually harassed at work. Another recent study, located at https://www.huffingtonpost.com/2015/02/19/1-in-3-women-sexually-harassed-work-

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

cosmopolitan_n_6713814.html, found that while 1 in 3 women have been sexually harassed at work, 71% of women who have been sexually harassed never reported it. According to the same study, a staggering 41% of women surveyed had encountered unwanted touching and sexual advances at work. Additionally, witnesses to sexual harassment frequently fail to report sexual harassment.

10.    According to Harvard Business Review, there are three potential reasons why it can be difficult to speak up about sexual harassment, including: fear of retaliation, the bystander effect, and a masculine culture that permits sexual harassment.

11.    The Harvard study found that most of the women who failed to report sexual harassment failed to do so because of fear of retaliation by the harasser or the organization. One of the potential drivers of this fear is that sexual harassment is often trivialized by organizations or results in hostility and retaliation against the victim. Unfortunately, the more powerful the harasser, the greater the fear of retaliation for reporting.

12.    The bystander effect is another potential factor that causes sexual harassment to go unreported. This means that others are less likely to help the victim of sexual harassment when others are present. The bystander effect occurs for two reasons – diffusion of responsibility (feeling like the others present will do something) and social influence (if no one else intervenes to assist the victim, others feel like failing to intervene is correct). The failure to intervene then tells the victim that the behavior is condoned by the observers who failed to intervene, which discourages the victim from reporting.

13.    Finally, particularly for those in predominantly masculine industries such as law enforcement, men tend to use subjugation of women as a way to relate to other men and prove masculinity, while reinforcing the lower status of women. Women who want to be part of the higher status group will then play along with sexual harassment because they do not

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

want to be further alienated from the high status group (the male coworkers). In other words, female victims of sexual harassment play along in order to be seen as "one of the guys."

14.     The Harvard study cited above explains that organizations can decrease sexual harassment in the organization and better encourage women to report sexual harassment by providing better training (e.g., training that targets the bystander effect), developing clearer HR and reporting systems, and assessing and improving the organization's culture. Due in part to the Defendants' failure to have proper safeguards in place, the Plaintiff was the victim of sexual harassment and sexual assault, and despite that one or more of the named Defendants and their employees had actual knowledge of the sexual harassment and/or sexual assault, nothing was done to intervene or ensure that there were consequences for same.

15.     Taxpayers should also be concerned, as the Harvard study estimates that sexual harassment costs organizations $22,500.00 a year in lost productivity for each employee affected, among other negative consequences.

**FACTUAL BACKGROUND**

16.     The following is a chronological summary of the sexual harassment, sexual assault, and violations of Civil Rights of which the Plaintiff fell victim.

17.     Prior to becoming elected Sheriff, the Sheriff was employed by Greenville County SO as a deputy. Prior to becoming Sheriff, the Sheriff had a well-documented history of misconduct, including alleged sexual harassment of at least one employee. Greenville County and Greenville County SO were well-aware of this history prior to the Sheriff taking office. The following links are publicly available information pertaining to prior incidents:

        a.     http://wspa.com/2016/06/20/campaign-mudslinging-gets-personal-in-

7

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

race-

for-greenville-county-sheriff/

b.    http://www.foxcarolina.com/story/32263910/sheriff-loftis-will-lewis-spar-

ahead-of-runoff-election

c.    https://www.dropbox.com/sh/1t4z6xg66vz9p1f/AABw7U16LANyxXSlx

KRYZVRNa?dl=0

18.    The Sheriff was elected Sheriff of Greenville County, South Carolina and hired the Plaintiff as his employee shortly thereafter. The Plaintiff's official job title was Administrative Coordinator to the Sheriff.  The Plaintiff's job consisted of going everywhere the Sheriff went: all meetings, conferences, speeches, luncheons, officer shootings (in the middle of the night), murders, crime scenes, trainings, press conferences, and anywhere else the Sheriff went. The Sheriff's stated purpose of this arrangement was that he could have the Plaintiff there to record all of his meetings, and contribute outsider's perspective to law enforcement decision making. The Sheriff also wanted the Plaintiff to accompany him everywhere so that the Plaintiff could quote back to him things he said in previous meetings that were relevant to subsequent meetings.

19.    The sexual harassment began almost immediately after the Plaintiff began her employment, and increased in severity as time passed. One of the earlier examples of sexual harassment occurred on December 20, 2016, the day after the Sheriff's private induction ceremony at the Poinsett Club in Greenville, SC. The next day at work, the Sheriff said he wanted to talk to the Plaintiff privately. Someone was in the office that the Plaintiff shared with the Defendant, so the Sheriff pulled the Plaintiff into the office beside the normal

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

office. He told the Plaintiff how "gorgeous" and "stunning" she had looked at the ceremony the night before in her dress. He said he wasn't trying to make the Plaintiff uncomfortable; he just wanted her to know. He went on to explain that the Plaintiff was exceeding his expectations for the position.

20.    Shortly thereafter, in early January 2017, the Sheriff gave the Plaintiff a new county car. When the Plaintiff stated that she felt guilty about having a new car while some employees (even command staff) were driving cars with over 200,000 miles on them, he said it is just another perk of the Plaintiff's job: "The best gets the best."

21.    Shortly thereafter, on January 17, 2017, the Sheriff and the Plaintiff went to BMW for (what the Plaintiff was led to believe was a meeting). Another employee went to the event as well, but the Sheriff arranged for the other employee to drive separately, with the Plaintiff and Sheriff riding together, as was the Sheriff's policy. The "meeting" ended up being the BMW Performance Driving School. The Sheriff explained that this was a once in a lifetime experience and he wanted the Plaintiff to do it. He explained that he and the Plaintiff would be "partners," and would drive different BMW's at high speed on dangerous courses. Following the race, the Sheriff said he thought the Plaintiff's driving was "sexy" and that he was proud of the Plaintiff for giving it her all and getting out of her comfort zone.

22.    On February 3, 2017, on a day that the Sheriff knew the Plaintiff's then-husband was out of town for work, the Sheriff sent a text to the Plaintiff stating, "How is the Moscato and bachelor?"

23.    The Plaintiff separated from her husband on February 15, 2017, for reasons unrelated to the Defendant. On February 16, 2017, the Plaintiff told the Sheriff that she was separating from her husband. The Sheriff subsequently asked for the Plaintiff to ride in his car with him to the Greenville Hospital (his dad was in the hospital and he was going to visit him)

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

to explain what was going on. The Sheriff asked many specific, personal questions regarding the reasons for the separation. During the conversation, the Sheriff went into great detail about what a "great body" the Plaintiff had and suggested that the Plaintiff's husband was "stupid" for not fully appreciating same. The Sheriff indicated that if he was 22 again, he would be "all over that" because the Plaintiff was the "full package" - she wasn't just cute, she was smart and could carry on an intellectual conversation. The Sheriff also suggested he could put her in touch with some great divorce attorneys.

24.    On February 16, 2017, the Sheriff called the Plaintiff late in the evening, at approximately 9 p.m. The Sheriff indicated during the call that he had talked to Kernell and a major in the sheriff's department and that they had decided it was time to go out of town for a meeting. The Sheriff said he wanted to bring the Plaintiff along and that the other employees, including Kernell, thought it was a good idea. The Sheriff said that he and the Plaintiff needed to discuss the budget and present a plan to the county administrator, and that they could only really do this out of town, because they can't get any work done in the office. He asked if the Plaintiff would be comfortable going to Charlotte or Atlanta. The Plaintiff agreed, but indicated she did not have a preference. The Sheriff added that this could be a time for he and the Plaintiff to kick back, relax, throw a ball cap on and "put a few back" because no one would know who he was.

25.    At some point between Feb. 15th and March 7th, the Sheriff said, "Hey cutie" as the Plaintiff got in his SUV on one of the 2 a.m. calls on which he required the Plaintiff to accompany him.

26.    On February 25, 2017, the Plaintiff rode to Clemson, SC with the Sheriff for a speech. They met another law enforcement officer there, because the other law enforcement officer and the Sheriff were doing the speech together. The following is photo of the Sheriff

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

and the Plaintiff at the event:



At the event, the Sheriff told the other law enforcement officer that he needed to "get a Savanah," because that's how he got everywhere he needed to be and stayed on track. The Sheriff told the Plaintiff after the event that the other law enforcement officer leaned in and told the Sheriff that he "could not have a Savanah" because he would get himself in trouble. The following is a photo of the Sheriff and the Plaintiff at the event: The Sheriff indicated to the Plaintiff later in the ride that he wasn't going to tell his wife the Plaintiff was going to on the upcoming trip to Charlotte. The Plaintiff asked him why, and told him that made her feel uncomfortable. The Sheriff said he just didn't want to argue with his wife for no reason at all, that there was just no reason to bring it up to her.

27. Also during various trips in the car in February of 2017, the Sheriff would ask the Plaintiff personal and sexual questions about her husband, such as how often they had sex, whether the Plaintiff ever wore anything special for the husband, how long the sex would be, whether they used toys, and various other areas of inquiry into the specifics of the sexual relationship between her and her husband. The Sheriff explained that he considered the Plaintiff to be his best friend, even though she was 20 years younger, and that he felt like he could talk to her about anything. During this same time frame, the Sheriff routinely made

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

comments to the Plaintiff that made her uncomfortable, such as:

    a.    "You look really cute today"

    b.    "Those pants suit your figure"

    c.    "You've got a really cute figure."

    d.    "I can really tell you've been working out."

28.    The Sheriff scheduled the "out of town trip" for March 7, 2017 in Charlotte. Kernell approved the trip, and actually agreed to attend the trip, despite the knowledge that the Sheriff, who had a background of sexually inappropriate behavior with female employees, would be supplying alcohol to the Plaintiff and would have the opportunity to be alone with the Plaintiff after the heavy drinking event.

29.    On the day of the Charlotte trip, the Sheriff came to pick the Plaintiff up at her house to go to Charlotte. He did not let the Plaintiff know he was on the way to her house. He just showed up. The Plaintiff came to the door and let him in. The Sheriff asked to use the restroom. The Plaintiff pointed him in the direction of the spare bathroom (located right next to the master bedroom), but he spotted the master bedroom and entered. He said it was really nice and admired the Plaintiff's furniture and laughed about The Bachelorette being on the TV. The Sheriff subsequently insisted on helping the Plaintiff pack her belongings in the car and they left for Charlotte. On the ride to Charlotte, the Sheriff kept talking about how much he could not wait to just kick back and have a drink. He emphasized that he really wanted to get to Charlotte before everyone got there because he wanted it to just be he and the Plaintiff drinking for a little while. He said everyone else talks only about work and he did not want to talk about work. He felt like he could carry on a conversation with the Plaintiff that was not work-related. This was not the first time that the Sheriff had emphasized he wanted to drink alone with the Plaintiff. He had mentioned this on multiple different occasions prior to the trip.

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

The actions of Kernel, the final policymaker for Greenville County regarding approval of out of town budget meetings, finally supplied the Sheriff the opportunity to drink alone with the Plaintiff.

30.    The Plaintiff and the Sheriff eventually arrived at the Hyatt Place House Hotel located at 435 E Trade St, Charlotte, NC 28202, which is shown in the following Google Earth screenshot:



Upon arriving in Charlotte, at the valet, the Sheriff insisted on unloading the bags. The Sheriff put a large bottle of dark liquor in the Plaintiff's bag. The following is a photo of the bag in which the Sheriff placed the bottle:



ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

The bottle was placed inside the bag, on top of the Plaintiff's clothing.  When the Plaintiff asked why the Sheriff did this, he said he didn't want to carry it up in plain sight, since he was the Sheriff, that he would "come and get it later." The Plaintiff and the Sheriff subsequently went to their rooms to unpack.

31.     Shortly thereafter, the Plaintiff, the Sheriff, Kernel, and Major Marcus Davenport went to the hotel bar for a drink. The Sheriff supplied the Plaintiff with two drinks at the bar before others arrived. After approximately 30 minutes, Kernel, an assistant county administrator, and another county administration official arrived. They sat with the Plaintiff and the Sheriff in the bar in the hotel lobby. Everyone had drinks and ordered appetizers. At this point, the Sheriff kept making fun of how the Plaintiff was "babysitting" her drinks, suggesting that she need to drink faster. This was in plain view of all others in attendance, including Kernel. Upon information and belief, the Sheriff did not pressure any of the other attendees to drink faster.

32.     Everyone, including the Sheriff and Kernel, then decided to go to an Irish pub because the hotel bar was closing around 11 p.m. Everyone then had two group shots of "cinnamon toast crunch." The Plaintiff had a water as well. Shortly thereafter, the Sheriff asked the Plaintiff to step outside with him. The Sheriff told the Plaintiff that he was going to ask Kernell the following day during the budget meeting for the Plaintiff to get a raise. The Plaintiff told him that she did not think she was deserving of a raise; that she believed the deputies needed it more than she did, and that she had only been working for a few months. He said he had already discussed it with members of command staff and that he thought the Plaintiff had worked her "ass off" and deserved it. When leaving the Irish pub, the Sheriff tried to lift the Plaintiff up and put her on his shoulders in plain view of the other attendees. The Sheriff dropped the Plaintiff, and another employee of the Sheriff's office caught the

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Plaintiff, keeping her head from falling directly on concrete. The group headed back to the hotel.

33.     After everyone returned to the hotel, they got on the elevator to return to their rooms. Each member of the group, including Kernell, exited the elevator prior to the Plaintiff, causing the Plaintiff and the Sheriff to be alone in the elevator. When the Plaintiff was about to exit the elevator, the Sheriff told the Plaintiff that he needed to stop by the Plaintiff's room to get the liquor that he had placed in her bag earlier in the day. The Plaintiff agreed to allow him to come by the room to retrieve the liquor. When the Sheriff arrived at the Plaintiff's hotel room, he welcomed himself into the hotel room and went straight for the bag where the liquor was. The Sheriff then poured two drinks of what appeared to be a brown liquor. The Plaintiff had a few sips of her drink, and she began to feel uncomfortable. The Plaintiff does not recall the Sheriff drinking any of the drink that he poured for himself. The Plaintiff sat on the couch in the room. The Sheriff sat on the recliner, flipping through channels until he got to a sports channel. The Plaintiff put her feet (wearing Tom wedges) on the coffee table.

34.     The Sheriff then leaned over and started untying the Plaintiff's shoes. The Sheriff then walked over and sat beside the Plaintiff on the couch. The Sheriff subsequently put his arm around the Plaintiff. The Plaintiff got up, because this made her feel uncomfortable. The Sheriff got up as well and forcibly kissed the Plaintiff. The Plaintiff specifically remembers telling him the Sheriff that this manner of physical contact was a bad idea. In a further attempt to stop the Sheriff's advances, the Plaintiff brought up the Sheriff's wife. The Sheriff went into a long explanation about his lack of intimacy at home.

35.     The Sheriff then took off his button-down shirt, exposing the white t-shirt underneath. He then laid down on the bed and then went into detail about how long it had been since he had sex with his wife. The Sheriff told the Plaintiff that she needed to relax. The

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Plaintiff then began to slip in and out of consciousness.

36.     The Plaintiff remembers two parts of the subsequent events. The Plaintiff remembers regaining consciousness when the Sheriff was on top of her, having sex with her. It took the Plaintiff a second to realize what was happening and she had no idea how long it had gone on. The Sheriff asked the Plaintiff if she was ready for him to "finish," and the Plaintiff said yes. The Sheriff then giggled, making a joke about how long  he could "last," and added that he was sure the Plaintiff was not used to that. The Plaintiff then lost consciousness again.

37.     The Plaintiff's next memory is waking up at 5 am to find the Sheriff still in the Plaintiff's bed. The Sheriff suggested they should go to his room and sleep. The Plaintiff does not remember walking to the Sheriff's room, but her next memory was waking up to daylight in the Sheriff's room. The Sheriff then leaned over the chair in his living room area and asked the Plaintiff to come to him. The Plaintiff felt awkward, like a child. The Sheriff tried to kiss the Plaintiff and she turned her head, such that the Sheriff ended up kissing her cheek. The Sheriff said, "I just wanted to make sure we were alright." Without responding, the Plaintiff returned to her room.

38.     Upon returning to her room, the Plaintiff took a shower and laid down. The Plaintiff received a call from the Sheriff saying that he and the rest of the crew were going out for coffee. The Plaintiff told the Sheriff she wanted to rest. She felt sick and tired. The Sheriff returned to the Plaintiff's room to retrieve his button-down shirt and to bring the Plaintiff coffee.

39.     The Plaintiff then joined the group for a business meeting in the lobby, which lasted an hour or so, and then the Plaintiff went to lunch with the group. The Plaintiff could not eat much at lunch because she felt sick. At that point, the Plaintiff was trying to remember everything she had drank. She blamed the sexual encounter with the Sheriff on herself. She

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

could not believe that she did not do more to prevent it from happening. She then tried to forget that it happened. Upon further reflection, the Plaintiff realized that she had not consumed enough alcohol the night before to lose consciousness, leading her to believe that the liquor drink in her hotel room contained some kind of drug. Concerned about her reputation, her pending divorce action, losing her job, and retribution, the Plaintiff decided not to report what had happened the night before.

40.     At dinner that evening, the Sheriff began acting territorial over the Plaintiff in plain view of the other county employees at dinner, including Kernell. The Sheriff became visibly angry when another patron came up to the Plaintiff and asked for her number, and the Sheriff subsequently put his hand in the Plaintiff's back pocket. The Plaintiff was uncomfortable, but she wasn't sure what to say or how to react, and the other county employees in attendance, including Kernell, did not do anything to intervene. The group all went out for drinks after dinner, and the Plaintiff joined them, because she was under the impression that she was required to do so as part of her job.

41.     On the walk back to the hotel, the Sheriff pulled a bottle of lubricant out of his back pocket, which he apparently had purchased earlier that day from the CVS on Trade Street in Charlotte. Apparently, the Sheriff developed the impression that lubricant was needed for any future sexual activity based on the previous night's sexual intercourse, which suggests that the Plaintiff was indeed unconscious during the sexual intercourse. The Sheriff then asked, "My room or yours?" The Plaintiff then laughed nervously, brushed him off, and said "neither." The Sheriff persisted, asking the Plaintiff to at least step up to his room and talk about it. Since the Plaintiff continued to be in fear of losing her job, among other negative consequences of rejecting the Sheriff, the Plaintiff complied and stepped into his room.

42.     Upon arriving at the room, the Plaintiff explained that she did not want any part

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

of whatever he was trying to do. She explained that she did not remember much of the night before, but that when she looked at herself in the mirror that morning, she was not happy. The Sheriff said that the Plaintiff was being irrational, and thinking too much into it. The Sheriff said that the Plaintiff overanalyzes everything. He then began cussing and getting visibly frustrated, at which point the Plaintiff immediately left the room. The Sheriff (wearing no shoes) chased the Plaintiff into the elevator. The Plaintiff told the Sheriff to leave her alone. The Plaintiff went to her hotel room. After falling asleep, the Plaintiff awoke to a phone call from the Sheriff asking her to open her hotel room door, and she did as instructed. The Sheriff asked if he could come in to apologize. The Plaintiff told him that she was tired, but let him in as requested.

43.     The Plaintiff sat on the end of the bed (with her feet on the floor). The Sheriff was standing where the living room and bedroom met. The Sheriff dramatically put his hands up in the air and announced, "Hands off. I swear to God I won't touch you. Just let me stay." The Sheriff explained that he was sorry and that he always screws everything in his life up. He said no matter what he fails at everything. He said sooner or later he would fail at being a Sheriff. The Sheriff then asked to stay the night, but the Plaintiff said no. The Sheriff persisted, and despite being uncomfortable, the Plaintiff complied on the condition that the Sheriff was not allowed to touch her in any way.    The Sheriff had convinced the Plaintiff that he was sorry and that there would be no further sexual advances. The Sheriff convinced the Plaintiff to let him sleep on the other side of the bed.

44.     The following morning, March 9, 2017, the Plaintiff woke up in the hotel room bed to the Sheriff's fingers inside the Plaintiff, despite the promise that he would not touch the Plaintiff again. The Plaintiff said, "See, this is why I didn't want you to stay the night." The Sheriff giggled and continued to sexually assault the Plaintiff. The Plaintiff did not physically

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

or verbally reject the Sheriff this time like she had the previous night, but the insertion of his fingers was certainly not consensual and she didn't know what else to do in that moment. The Plaintiff was the Sheriff's subordinate, the Sheriff was physically and politically more powerful than the Plaintiff. After the Sheriff was done, he left. The Plaintiff showered, feeling violated and disgusted.

45.     Shortly thereafter, the Sheriff instructed the Plaintiff to go to breakfast (maybe around 9 a.m.) with him and another employee. The Plaintiff ordered a plate of food, but could not eat anything because she was sick to her stomach. After eating, everyone packed and headed back to South Carolina, with the Plaintiff being forced to ride home with the Defendant. The car ride was awkward, but the Plaintiff and the Sheriff did not speak much. The Sheriff took business calls. At one point, the Sheriff warned, "What happens in Charlotte, stays in Charlotte." The Plaintiff laughed it off as a self-preservation mechanism.

46.     Over the course of the several days in March 2017, the Sheriff brought up the first night in Charlotte, and each time the Plaintiff would respond that she did not remember that much of it. The Sheriff said he was a little offended, but that the Plaintiff did have a lot to drink that night. The Sheriff brought up comments that the Plaintiff had apparently made during the sexual incident like, "I feel like I'm not doing my job." The Sheriff assumed the comment related to the Sheriff "lasting so long." Each time the Plaintiff responded that she did not remember much from that night. The Sheriff responded that it was one of the best nights of his life.

47.     The Plaintiff had not fully processed what happened, and she really wanted to keep her job, so she thought best to try to pretend like the previous events never happened and to insist on a strictly professional relationship. For a period of time, the Plaintiff and the Sheriff began to work well together again, professionally, without the awkwardness, because

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

at the Plaintiff's insistence, the Sheriff stopped bringing Charlotte up. In part, this was because the Plaintiff gave the Sheriff an out by allowing the Sheriff the excuse of him being extremely drunk.

48.    On Wednesday, March 22, 2017, the Plaintiff attended a campaign event at the Carolina Ale House to increase funding in the Sheriff's campaign account. The Plaintiff and the Sheriff rode together to the event at the Sheriff's insistence. At the event, the Sheriff attempted to pressure the Plaintiff into drinking faster and more. The Sheriff ordered the Plaintiff two glasses of wine after the Plaintiff said she was done drinking because she had to drive home. The Plaintiff and the Sheriff then got in the car to leave. When the Plaintiff refused to go anywhere else with the Sheriff and told him to go home to his wife, the Sheriff became extremely angry.

49.    The following day, Thursday, March 23, 2017, the Sheriff then began treating the Plaintiff terribly at work. The Plaintiff's coworkers began asking what she did to make the Sheriff so mad, because he did not start acting rudely and angrily until the Plaintiff arrived at work. The Sheriff informed the Plaintiff that she would be spending more time at the office, which was important because she took the job because it did not involve sitting the in the office all day. This mistreatment and retaliation continued for the next several weeks. For example, the Plaintiff was asked to stay late to work until 10 or 11 p.m., because the Sheriff's office was on standby due to a storm. When the Plaintiff asked for the Sheriff's permission to go home, he said "you're a grown ass woman you can go home whenever you want to go home." This comment was made in front of a coworker, and the coworker asked if he needed to leave the room. That same week, the Sheriff threatened the Plaintiff that if she didn't start "letting him into every area of her life," and "being 100 percent honest about everything," that the Plaintiff would need to be replaced, because he needed a "best friend" that he could talk to

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

about absolutely everything, and he needed that to be mutual. He needed trust.

50.     On March 28, 2017, the Plaintiff was home sick with the flu. The Sheriff knew that the Plaintiff had been to the county doctor the day before. The county doctor had diagnosed the Plaintiff with bronchitis, but the Plaintiff called her the morning of the 28th and told her the Plaintiff had been running a 104-degree fever. The county doctor then told the Plaintiff that she definitely had the flu, so the Plaintiff called to tell the Sheriff that she would not be in to work. The Sheriff said he wanted to stop by and check on the Plaintiff, but she asked him not to do that and said that she would be fine. The Sheriff came to the Plaintiff's house anyway. The Sheriff arrived at the Plaintiff's home with a bag of groceries and asked to be let in, so the Plaintiff complied. The Sheriff began to discuss how bad things had been lately. He told the Plaintiff he was sorry, but he did not understand why the Plaintiff had been acting so stand offish. The Plaintiff made up something about having trust issue, and the Sheriff responded angrily and said something hurtful. The Plaintiff cannot remember exactly what the Sheriff said, but it was something about how cold-hearted she was. The Plaintiff began to cry and asked the Sheriff to leave. The Sheriff walked out, but only for a minute. He came right back in. He came to the couch and hugged the Plaintiff. He said, "You never cry. I must have really hurt you. I am so sorry." The Plaintiff explained that she just wanted things to go back to the way they were supposed to be, with everything being friendly, professional, and not physical. The Sheriff said he was not sure if things would ever be the same, because Charlotte brought up feelings that he though he never had. He said he was trying to process them. He said he would try his best to treat the Plaintiff better at work. He unloaded the groceries in the kitchen. The Plaintiff tried to stay in the kitchen, but the Sheriff picked the Plaintiff up and carried her to the bed and said, "Let's get you to bed." The Plaintiff pretended to be tired so that the Sheriff would leave. The Sheriff kissed the Plaintiff on the forehead and

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

tucked her in. The Sheriff tried to come back over that night and the day after. To prevent this from happening, the Plaintiff had to lie and tell him her mom was over making dinner, and that the Plaintiff's husband had stopped by to pack his things. The Plaintiff feared what would happen if the Sheriff returned to her home, but at the same time, she feared what would happen if the Sheriff felt rejected.

51.    In April 2017, a promotional video of employees working out at Paris Mountain was scheduled to be filmed. The Plaintiff was supposed to ride to the event with another employee, but the Sheriff showed up to pick her up instead. The Plaintiff explained that she still had to change into her workout clothes for the video. The Sheriff said she could just change in his SUV when they got there, and that she could use the back because the windows were tinted. The Plaintiff did this, but she drove the SUV far away from everyone else to change because she was uncomfortable being anywhere close to the Sheriff when changing. When they left the event, the Sheriff asked the Plaintiff who she thought was the hottest guy in the sheriff's office. The Plaintiff would not answer. The Sheriff began listing off males in the office, and indicated that one of them (who it was obvious he felt threatened by) was not entirely heterosexual to dispel any notion that the Plaintiff should choose that employee. The Sheriff concluded the conversation by warning that the Plaintiff was not allowed to date anyone from the Sheriff's Office.

52.    In April 2017, the Plaintiff obtained agreement from the Sheriff that the Sheriff would respect the Plaintiff's boundaries and that the relationship going forward would be strictly professional, appropriate, and friendly. This occurred in the Sheriff's office, behind closed doors, after hours. It was not unusual for the Sheriff to create reasons for the Plaintiff to have closed door meetings with the Sheriff after hours. Despite the agreement, at the end of the conversation, the Sheriff hugged the Plaintiff and kissed her on the forehead.

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

53.    On April 15, 2017, the Plaintiff went hiking with a friend from high school who was employed by another law enforcement agency. The Sheriff called the Plaintiff on her county phone, but the Plaintiff did not answer. When the Plaintiff called the Sheriff later, the Sheriff questioned the Plaintiff about the hike. He warned that the Plaintiff should not start dating again, that she was not ready to start dating again. Feeling that she needed to explain herself in response to the inappropriate comments from her boss, the Plaintiff tried to explain that the hike was with a friend and it was not a date.

54.    On April 16, 2017, Easter, the Sheriff called the Plaintiff as she was in the parking garage about to meet her husband downtown. The Plaintiff told the Sheriff that she was with her mom and family because she knew he would be mad that she was out with her husband. The Sheriff began laughing strangely and said "okay, that's cool" as if he knew she was lying to him. The next day at work, the Sheriff said to the Plaintiff that he was so mad, and that he knew the Plaintiff had been lying because he "is good at what he does." Upon information and belief, the Sheriff was able to use Greenville County SO resources to track the Plaintiff's activities.

55.    Later on in April of 2017, the Sheriff began prying even more into the Plaintiff's personal life and becoming even more territorial. If the Plaintiff was leaving the office before 7 p.m., the Sheriff would become visibly frustrated and wanted to know what the Plaintiff's plans were and who the plans were with. When the Sheriff's wife and children were out of town, he expected the Plaintiff to work long night time shifts with him. When the Plaintiff told the Sheriff she would rather not be working all night on a Saturday night after working all week, the Sheriff would be offended and ask what her plans were.

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

56.    Shortly thereafter, the Sheriff required the Plaintiff to go with him after hours for ice-cream, to the Cold Stone Creamery on Woodruff Road, depicted in the following image:



The Sheriff said they deserved it. The Sheriff made the Plaintiff feed him some of her ice-cream with her spoon. The Plaintiff expressed that she thought this was awkward, and that anyone in public could see this and think it was inappropriate.

57.    Also in April of 2017, the Sheriff called the Plaintiff to his office to discuss the topic of the Plaintiff dating. The Sheriff asked to go through the Plaintiff's personal phone. The Plaintiff said no, and the Sheriff began to question why she would not let him go through her personal phone. The Plaintiff told him it was her business. The Sheriff warned that one day he would get into it, and that he didn't understand what she was trying to hide. The Plaintiff responded that she wasn't hiding anything, and that he could look through her county phone any time he wanted. The Sheriff reiterated that he didn't think the Plaintiff was ready to start dating again. The Sheriff went on to specifically say that he would be jealous if the Plaintiff dated anyone right now, because he was still trying to "work through those feelings". The Sheriff was upset that the Plaintiff had not shared her feelings with him. He expressed that he

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

thought she was handling the situation a whole lot better than him, so she must not have those kinds of feelings for him. The Plaintiff said she does not like to talk about her feelings, and she likes for there to be a wall there, especially in the professional setting. The Sheriff said with the wall, there is no trust and that they needed to trust each other.

58.    On April 18, 2017, the Sheriff called the Plaintiff to tell her he wanted to come to her house to get a pressure washer. Not wanting to be alone at her house when he arrived, the Plaintiff left the house at around 7 p.m. and texted the Sheriff that the neighbors would let him in the garage to get the pressure washer. The Plaintiff then went to Chick-Fil-A in Greer, that is depicted in the following image:



The Plaintiff subsequently ordered food and sat in the Chick-Fil-A parking lot eating dinner. The Sheriff called again, and the Plaintiff told him to go ahead to her house, and that she was having dinner. Shortly thereafter, the Sheriff showed up behind the Plaintiff's car at Chick-Fil-A to follow the Plaintiff to her home. This was after 9 p.m. The Plaintiff received a phone call from her sister at this time, and the Plaintiff indicated to her sister that her boss was following her. The Plaintiff discussed with her sister that she was going to begin recording conversations with the Sheriff to obtain a record of the stalking in case something bad happened. The Plaintiff's sister did not know anything about the situation at this point, but she was worried based on the tone of the Plaintiff's voice, and said she was going to continue to call me until

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

the Sheriff left. When they arrived at the Plaintiff's home, the Sheriff began to tell the Plaintiff that he intended to have the county pay for them to go to Reno for a conference. The Sheriff explained that the county would pay for two airline tickets, but only one room, so he and the Plaintiff would need to share a room. When the Plaintiff declined, the Sheriff became angry and stormed away from the house. The following is a link to the ensuing recorded conversation regarding the proposed taxpayer-funded work-related trip to Reno: **https://drive.google.com/open?id=0B9JQDr0ZfB3ZYWxxcWJaRnRqckU**.     Additional recordings can be accessed at the following links:

a.    Recording 1 (April 18th, 2017) (the Plaintiff and the Sheriff) https://drive.google.com/open?id=0B9JQDr0ZfB3ZSTl6TEJpU2RKSlE;

b.    Recording 2 ( April 18, 2017) (the Plaintiff and the Sheriff) https://drive.google.com/open?id=0B9JQDr0ZfB3ZYWxxcWJaRnRqckU

c.    Recording 3 (April 19, 2017) (the Plaintiff and the Sheriff) https://drive.google.com/open?id=0B9JQDr0ZfB3ZUnRrRkdJaGtIZTQ

d.    Recording 4 (April 19, 2017) (the Plaintiff and the Sheriff) https://drive.google.com/open?id=0B9JQDr0ZfB3ZdEhocktGWFB3akk

e.    Recording 5 (April 19, 2017) (the Plaintiff and the Sheriff) https://drive.google.com/open?id=0B9JQDr0ZfB3ZdTBSOVd2cjVzTIE

f.    Recording 6 (April 19, 2017) (the Plaintiff and the Sheriff) https://drive.google.com/open?id=0B9JQDr0ZfB3ZcWVDX0FVRnA5RlU

g.    Recording 7 (the Plaintiff and the Sheriff) https://drive.google.com/open?id=0B9JQDr0ZfB3ZOU8ySzBmRnk2bWc

h.    Recording 8 (April 20, 2017) (the Plaintiff and the Sheriff) https://drive.google.com/open?id=0B9JQDr0ZfB3ZM0NBamRNTnBkUGM

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

i.      Recording 9 (the Plaintiff and the Sheriff)
https://drive.google.com/open?id=0B9JQDr0ZfB3ZS1ktNHl4VHMtT
ms

j.      Recording 10 (April 24, 2017) (the Plaintiff, the Sheriff, other
Employees of the Defendants, including a Sergeant and a Captain)
https://drive.google.com/open?id=0B9JQDr0ZfB3ZZUt6aDVMRTF4
R1k

k.      Recording 11 (April 24, 2017) (the Sheriff and the Plaintiff)
https://drive.google.com/open?id=0B9JQDr0ZfB3ZY0dUUVFpWWQ
tOTg

59.     After the Chick-Fil-A incident, the Plaintiff broke down. She cried. She called
her sister and filled her in on what had happened. The Plaintiff explained to her sister that the
Sheriff was acting obsessed, infatuated, and otherwise acting inappropriately, and that he was
trying to get her to share a hotel room with him as part of a work trip to Reno. For the first
time, the Plaintiff explained to her sister that the Sheriff had forced himself on her in
Charlotte, but the Plaintiff did not divulge the extent of what happened.

60.     On April 19, 2017, the Plaintiff reported details of the inappropriate actions of
the Sheriff to more than one employee of the Sheriff's Office, and played portions of recorded
conversations with them. The policy, procedure, and/or practice in place at the Sheriff's Office
dictates that sexual harassment related complaints go to the Sheriff. As a result, the Sheriff
was almost immediately made aware of the Plaintiff's reports, and called the Plaintiff to
discuss while she was on the way to Florida for a funeral. When the Plaintiff would not
commit to rekindling the "friendship" with the Defendant, the Sheriff began to suggest that the
Plaintiff should no longer work at the Sheriff's Office. The Plaintiff was eventually told to put
in her two weeks' notice.

61.     The Plaintiff found out from coworkers that others at the Sheriff's Office and
the county had been aware of the red flags that inappropriate things were happening for quite a

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

while, and the Plaintiff also learned that other women had alleged in the past that the Sheriff had committed similar inappropriate acts. Notwithstanding, no employees of Greenville County or Greenville County SO intervened to protect the Plaintiff at any point in time prior to her constructive termination.

62.    The Plaintiff's report to Greenville County and the Greenville County SO regarding the sexual harassment, sexual assault, and misappropriation of public funds was made in part as a citizen.  It clearly addressed a matter of public concern, as the Sheriff has taken it upon himself to address the public specifically about the issues, as can be seen here http://www.foxcarolina.com/story/36616378/lawsuit-accuses-greenville-county-sheriff-will-lewis-of-sexual-harassment-sexual-assault. Additionally, the Plaintiff's interest in speaking outweighed the government's interest in providing efficient services.   The retaliatory discharge of the Plaintiff was caused by her exercising her right to speech.  For these reasons and others, the termination of the Plaintiff following her report of the above constituted a violation of the Plaintiff's First Amendment Rights.

63.    When the Sheriff learned that the Plaintiff intended to put in her two weeks' notice, which she did on April 24, 2017, the Sheriff instructed her to cease employment immediately as opposed to finishing out her two weeks.

64.    On April 25, 2017, the Sheriff called to beg the Plaintiff to come back, indicating that a raise for her had been approved by Kernell. The Sheriff referenced rumors going around as to why she had left, and suggested that if she returned, it would stop the rumors. The Sheriff said he would have someone bring her all of her county equipment back. The Plaintiff said she would think about it to end the conversation, but she followed up with an email the next day asking the Sheriff to cease all contact with her.

65.    On May 2, 2017, the Plaintiff drove herself to Spartanburg Mental Health and

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

waited for a walk-in appointment. When she saw the counselor, she disclosed (for the first time) that she had been sexually assaulted by her boss. The Plaintiff explained that she was having nightmares and couldn't sleep, and that she could not eat. The Plaintiff explained that she was generally miserable and needed help. The counselor referred to other medical providers for what appeared to be symptoms of post-traumatic stress disorder. The Plaintiff then went in to one of the recommended facilities for an intake and disclosed mostly everything to the intake specialist and manager, so that she could refer the Plaintiff to the appropriate counselor. The intake specialist indicated that she had a background in HR, and that the Plaintiff needed to go see an attorney. The Plaintiff went on to see a counselor, who provided treatment and prescribed medication. The Plaintiff continues to receive mental health treatment to this day.

## MITIGATION OF DAMAGES

66.    While the Plaintiff was offered her job back after the termination, if she were to accept reinstatement, it would make her subject to further victimization from one of the most powerful Greenville County and Greenville County SO officials, so she had no choice but to decline the offer of reinstatement.

67.    Accordingly, the Plaintiff attempted to mitigate her damages in other ways. She applied for numerous other positions, but she was unable to find another comparable job.

68.    The Plaintiff also attempted to publish a book regarding her account of what happened. This was an effort to mitigate her damages by earning income, and an effort to educate the public regarding a matter of important public interest. The Plaintiff wanted to inspire other women to come forward while mitigating her damages.

69.    In a further effort to mitigate her damages and educate the public on a matter of important public interest, the Plaintiff attempted to tell her story via a blog post on a website

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

operated by her sister, located at www.jacksonpinefarm.com, which includes a blog section that allows victims of tragedies to speak up and let people know what they have been through. More information regarding the blog and the Plaintiff's sister can be accessed at http://www.insideedition.com/headlines/12519-how-a-devoted-wife-communicates-runs-business-with-her-quadriplegic-husband?viewfull=true . The Plaintiff did not mention the Sheriff's name in the blog post, but she provided some of the details of what transpired in an effort to inform the public of this matter of important public interest.

70.     The Plaintiff took down the blog post and abandoned the effort to mitigate her damages through the book idea under the fear that she would be sued for defamation, despite the fact that all of the information that she provided was true and was a matter of important public interest.

## FOR A FIRST CAUSE OF ACTION
### (South Carolina Payment of Wages Act)

71.     Plaintiff repeats the foregoing paragraphs as if repeated here, verbatim.

72.     At all times pertinent hereto, some or all of the Defendants were the "employer" of the Plaintiff as that term is defined in S.C. Code Ann. Sec. 41-10-10(1).

73.     Monies owed to the Plaintiff by the Defendants constitute "wages" as defined in S.C. Code Ann. Sec. 41-10-10(2).

74.     Despite the termination of her employment with the Defendants, the Plaintiff has not been paid all wages due within the time required by S.C. Code Ann. Sec. 41-10-50.

75.     The Defendants' refusal to pay any wages owed to the Plaintiff is unjustified and without excuse.

76.     Due to the Defendants' unjustifiable refusal to pay the Plaintiff her wages, the Plaintiff has been denied earned wages and is entitled to three times the unpaid amount

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

pursuant to S.C. Code Ann. Sec. 41-10-80(c).

77.     Due to the actions of the Defendants in wrongfully refusing to pay the Plaintiff's earned wages, the Plaintiff has been forced to retain an attorney to represent her and is entitled to the judgment of the Court pursuant to S.C. Code Ann. Sec. 41-10-80(c) requiring the Defendants to pay her reasonable attorney's fees as well as the costs incurred in the prosecution of this action.

78.     The Plaintiff is therefore informed and believes she is entitled to judgment against the defendants for statutory damages, treble damages, actual damages, costs, and reasonable attorney's fees.

## FOR A SECOND CAUSE OF ACTION
### (Wrongful and Retaliatory Discharge in Violation of Public Policy)

79.     The Plaintiff repeats the foregoing paragraphs as if repeated here, verbatim.

80.     The Defendants terminated the Plaintiff because Plaintiff refused to tolerate sexual advances by the Sheriff.

81.     The termination of the Plaintiff violates public policy. Public policy mandates that an employee should not be forced to tolerate her superior's unwanted sexual advances and should not be physically attacked by her employer. Public policy further mandates that an employee such as the Plaintiff should not be terminated for notifying her supervisor that she wishes to be left alone and not touched in a sexual manner. Public policy further mandates that employer respect employees' request to be allowed to work in an environment free from sexual harassment and unwanted sexual advances.

82.     The Defendants forced the Plaintiff to be subjected to and suffer from sexual assaults and/or advances, which violates public policy. The Plaintiff refused to engage in mutual flirting or a sexual relationship with the Defendants, and that refusal contributed to the

31

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

Defendants' termination of the Plaintiff.

83.    The termination of the Plaintiff was in retaliation for the Plaintiff's actions/resistance/refusals protected by public policy.

84.    As a direct and proximate result of the Defendants' actions, the Plaintiff has been damaged.

85.    The Plaintiff is therefore informed and believes he is entitled to judgment against the Defendants for actual and punitive damages.

**FOR A THIRD CAUSE OF ACTION**
**(Common Law – Gross Negligence, Negligence *per se* – Hiring, Training, Supervision, and Maintenance as to Greenville County and Greenville County SO)**

86.    Plaintiff further alleges that the Defendants are responsible for the conduct alleged herein resulting in harm to the Plaintiff, as well as the conduct of their agents, servants and/or employees acting within the course and scope of their employment, as set forth above; said conduct being grossly negligent, willful and reckless, including, among others, without limit:

   a.   The failure to hire adequate and proper personnel;

   b.   The failure to establish policy or practice that would lead to the discovery of sexual harassment and/or assault by their employees and prevent the same from occurring;

   c.   The failure to establish policy or practice that would lead to the discovery of violent actions by their employees and prevent the same from occurring;

   d.   The failure to make periodic and proper investigations and take remedial action as might be necessary to prevent inappropriate actions and similar activities from occurring at the location where the Plaintiff was harmed;

   e.   The failure to perform a proper and adequate background check prior to employing the above-referenced officers;

   f.   In employing and continuing to employ the above-referenced officers when they knew or should have known their propensity to improperly handle their

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

duties;

g.  The failure to properly supervise their employees;

h.  The failure to properly determine and investigate complaints about and activities of the above-referenced officers;

i.  The failure to implement adequate security or safety measures designed to prevent or substantially reduce the likelihood that the Plaintiff or others similarly situated would be subjected to the acts of harassment, assault, and/or battery;

j.  The failure to provide necessary protection to the Plaintiff despite actual knowledge of specific risk of harm to her posed by the above described conduct and individuals;

k.  The failure to protect the Plaintiff from known risks of harm;

l.  The failure to use even slight care and caution in safekeeping the Plaintiff with whom they had a fiduciary duty;

m.  The failure to protect the Plaintiff from the above-referenced individuals, including Defendant Lewis;

n.  In creating an environment which subjected the Plaintiff to harassment, physical and mental harm;

o.  In creating an environment in which the above-referenced officers were permitted to prey on the vulnerability of those under their control;

p.  The failure to develop and disseminate a clear policy advising all employees that sexual harassment and/or sexual assault is a prohibited employment practice and one that would not be tolerated in a place of work;

q.  The failure to enforce policies prohibiting mistreatment of subordinate employees;

r.  The failure to have and/or implement special policies regarding the treatment of subordinate employees;

s.  The failure to train supervisors or other employees to recognize, investigate and properly remedy sexual harassment and/or sexual assault issues;

t.  The failure to properly train, monitor and supervise employees, to include and not be limited to Lewis and the officer who disregarded the specific and known risk of harm described above;

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

u.  The failure to maintain adequate security systems;

v.  The failure to maintain the Defendants' premises in a safe fashion;

w.  The failure to protect the Plaintiff from risk of harm after knowing of the assault against Plaintiff thereby placing her in fear of further harm; and

x.  For creating an unreasonably unsafe environment that allowed and caused the violent assault and sexual harassment to occur.

87.    The Plaintiff seeks damages against the Defendants for actual and consequential damages in an amount to be determined by a jury.

88.    As the above-described incidents involve numerous separate acts and/or omissions pertaining to the failure to train, supervise, and/or terminate the employment of numerous individuals who committed the acts and/or omissions, Plaintiff has alleged multiple "occurrences" pursuant to *Chastain v. Anmed Health Found.*, 388 S.C. 170 (2010) and *Boiter v. SCDOT*, 393 S.C. 123 (2011) for the purpose of calculating the applicable damages caps, if any.

### FOR A FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 Violation of Civil Rights as to the Sheriff)

89.    The above-referenced acts and/or omissions by the Sheriff occurred within the scope of his employment as the Sheriff of Greenville County and under the color of state law.

90.    The above-described acts and/or omissions of the Sheriff violated the Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

91.    Any reasonable person would be aware that the above-described conduct violated the Plaintiff's civil rights.

92.    As a direct and proximate result of the Defendant's violation of the Plaintiff's civil rights, the Plaintiff has suffered damages, including mental anguish, bodily injury, pain and suffering, emotional distress, humiliation, embarrassment, loss of enjoyment of life, past

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

and future medical care and treatment, loss of earnings, and loss of ability to earn money. The issues are continuing and the Plaintiff will suffer losses in the future. The Plaintiff also intends to seek reimbursement of attorney's fees and costs, as well as all available noneconomic and punitive damages.

93.     This Defendant is not entitled to qualified immunity under the current state of the law, and even if he was entitled to assert such a defense under the current state of law, qualified immunity is unlawful and should no longer be recognized as a defense to claims asserted under 42 U.S.C.A. § 1983. *See Ziglar v. Abbasi*, 26 Fla. L. Weekly Fed. S. 655 (U.S. 2017) (Thomas, J., concurring) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.") (citing Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. (forthcoming 2018) (manuscript, at 7-17), online at https://papers.ssrn.com/abstract=2896508 (as last visited June 15, 2017)).

94.     As a direct and proximate result of the unconstitutional conduct of this Defendant, the Plaintiff seeks, actual, compensatory, and punitive damages, as well as attorney's fees and costs. Plaintiff also seeks all other available damages, including any noneconomic or economic damages available to him.

### FOR A FIFTH CAUSE OF ACTION
**(42 U.S.C. § 1983 Violation of Plaintiff's Civil Rights
as to Defendant Greenville County and Defendant Kernell)**

95.     At all times material hereto, Greenville County was responsible for the Greenville County SO, and specifically the Sheriff, as well as the Greenville County SO's agents and employees, including hiring, supervising, overseeing, training and establishing policies, customs, and procedures to conform their conduct to the applicable state and federal laws.

96.     The Sheriff was the final policy maker for Greenville County regarding law

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

enforcement policies and acts, including Greenville County SO employment decisions. Additionally, Kernell was the final policymaker for Greenville County regarding approval of out of town trips, whether drinking would be allowed at out of town work trips, and as to how County funds could be used by the Sheriff for matters outside of standard law enforcement activities.

97.     Kernell and other employees of Greenville County had actual knowledge of prior incidents involving the Sheriff allegedly sexually harassing women, including the Plaintiff, and took no steps to place financial and/or other restrictions on the Sheriff's ability to prey on female employees (despite the power to do so). Kernell made the policy decision to have sexual harassment complaints pertaining to the Sheriff go to the Sheriff as opposed to someone other than the Sheriff, and Kernell chose not to implement an effective sexual harassment policy, procedure, and/or practice that would protect employees from victimization, and allow victims of sexual harassment to report same. This effectively deprived the Plaintiff of the opportunity to report the above-referenced conduct to anyone and violated the Plaintiff's civil rights.

98.     Kernell also made the policy decision to approve the use of taxpayer dollars for the Charlotte trip, which involved heavy drinking, and otherwise furnished the opportunity for the above-referenced harm to the Plaintiff. Additionally, employees of the county who attended the Charlotte trip, had actual knowledge of one or more of the Sheriff's actions described above, and failed to intervene to prevent the inevitable harm to the Plaintiff. This was in keeping with the policies, procedures, and/or practices in place at Greenville County and Greenville County SO.

99.     Greenville County's policies, procedures, customs, and practices of condoning unlawful and improper acts by their employees and Greenville County SO employees, of

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

failing to identify, train, discipline, and otherwise properly supervise officers who have engaged in unlawful and unjustified acts, and specifically of condoning and failing to appropriately respond, through discipline, training, supervision, or otherwise, to the prior misconduct of the Sheriff were a moving force behind the violations of the Plaintiff's civil rights.

100.    Greenville County displayed deliberate indifference to the rights of the Plaintiff by allowing the Sheriff to possess law enforcement authority despite his prior history of abuse of women dating back to at least 2011.

101.    Greenville County displayed deliberate indifference to the rights of the Plaintiff by allowing the Sheriff to possess law enforcement authority after his propensity to abuse that authority became evident.

102.    Greenville County displayed deliberate indifference to the rights of the Plaintiff by allowing the Sheriff to possess law enforcement authority despite actual knowledge of the Sheriff's unconstitutional abuse of the Plaintiff.

103.    As a direct and proximate result of the violation of the Plaintiff's civil rights, the Plaintiff has suffered damages, including mental anguish, bodily injury, pain and suffering, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, expense of medical care and treatment, loss of earnings, loss of ability to earn money, and various other categories of economic and noneconomic damages. The Plaintiff also claims reimbursement of attorney's fees and costs pursuant to 42 U.S.C. Section 1988, as well as punitive damages.

104.    This Defendant is not entitled to qualified immunity under the current state of the law, and even if it was entitled to assert such a defense under the current state of law, qualified immunity is unlawful and should no longer be recognized as a defense to claims

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

asserted under 42 U.S.C.A. § 1983. *See Ziglar v. Abbasi*, 26 Fla. L. Weekly Fed. S. 655 (U.S. 2017) (Thomas, J., concurring) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.") (citing Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. (forthcoming 2018) (manuscript, at 7-17), online at https://papers.ssrn.com/abstract=2896508 (as last visited June 15, 2017)).

### FOR A SIXTH CAUSE OF ACTION
**(42 U.S.C. § 1983 Violation of Plaintiff's Civil Rights as to Defendants John Does)**

105.    At all times material hereto, various John Doe employees of Greenville County SO and Greenville County, to be sued in their individual and official capacities, were responsible for the Greenville County SO, and specifically the Sheriff, as well as the Greenville County SO's agents and employees, including hiring, supervising, overseeing, training and establishing policies, customs, and procedures to conform their conduct to the applicable state and federal laws.

106.    Various John Does Greenville County and Greenville County SO employees were the final policymakers for additional policy decisions pertaining to the Greenville County SO and Greenville County, and otherwise exercised control over those organizations. Defendant John Does had actual knowledge of prior incidents involving the Sheriff allegedly sexually harassing women, and actual knowledge of the abuse of the Plaintiff, and took no steps to limit the Sheriff's ability to prey on female employees (despite the power to do so) or to protect the Plaintiff from further harm.  Defendant John Does also made various policy decisions that violated the Plaintiff's Constitutional rights. This effectively deprived the Plaintiff of the opportunity to report the above-referenced conduct to anyone and violated the Plaintiff's civil rights.

107.    Defendant John Does condoned and enabled the unlawful and improper acts

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

described above and failed to identify, train, discipline, and otherwise properly supervise officers who have engaged in unlawful and unjustified acts, and specifically of condoning and failing to appropriately respond, through discipline, training, supervision, or otherwise, to the prior misconduct of the Sheriff were a moving force behind the violations of the Plaintiff's civil rights.

108.    Defendant John Does displayed deliberate indifference to the rights of the Plaintiff by failing to protect the Plaintiff from the specific and known risk of harm posed by the Sheriff.

109.    As a direct and proximate result of the violation of the Plaintiff's civil rights, the Plaintiff has suffered damages, including mental anguish, bodily injury, pain and suffering, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, expense of medical care and treatment, loss of earnings, loss of ability to earn money, and various other categories of economic and noneconomic damages. The Plaintiff also claims reimbursement of attorney's fees and costs pursuant to 42 U.S.C. Section 1988, as well as punitive damages.

110.    Defendant John Does are not entitled to qualified immunity under the current state of the law, and even if they were entitled to assert such a defense under the current state of law, qualified immunity is unlawful and should no longer be recognized as a defense to claims asserted under 42 U.S.C.A. § 1983. *See Ziglar v. Abbasi*, 26 Fla. L. Weekly Fed. S. 655 (U.S. 2017) (Thomas, J., concurring) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.") (citing Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. (forthcoming 2018) (manuscript, at 7-17), online at https://papers.ssrn.com/abstract=2896508 (as last visited June 15, 2017)).

111.    The Plaintiff specifically reserves the right to amend the complaint to substitute

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

the real names of Defendant John Does as appropriate.

## FOR A SEVENTH CAUSE OF ACTION
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq.)**

112.    The Plaintiff has filed an EEOC charge, and specifically reserves the right to amend her complaint to assert Title VII claims when she receives the right to sue letter. The Plaintiff intends to seek all available damages as part of this claim.

## FOR AN EIGHTH CAUSE OF ACTION
**(Common Law Liability for Negligence, Gross Negligence, & Recklessness as to the Sheriff and Defendant John Does)**

113.    The Plaintiff repeats the foregoing paragraphs as if repeated here, verbatim.

114.    This cause of action is asserted in the alternative, in the event that it is determined that any of the above-described conduct was outside of the scope of any of the referenced individuals' scope of work.

115.    The Defendants had a duty to avoid negligently causing the Plaintiff emotional distress, unnecessary expense, avoid defaming the plaintiff, take reasonable measures to keep the plaintiff safe from attacks by coworkers, take reasonable measures in hiring employees, avoid subjecting the plaintiff to known criminal activity of other employees and sexual harassment, avoid attacking the plaintiff, avoid entrusting property and space to employees known to use intoxicants, and other duties as will be shown through discovery and at trial.

116.    The defendants negligently and recklessly breached these duties to the plaintiff.

117.    As a result of Defendants' breaches, the Plaintiff has suffered some or all of the following injuries and damages;

      a.    Physical manifestation of emotional distress;

      b.    lost ability to earn wages;

      c.    damage to her reputation;

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

  d.  time and wages lost from her gainful employment;

  e.  legal fees and expenses;

  f.  termination from her job;

  g.  physical pain and suffering;

  h.  withheld wages;

  i.  sexual assault and/or harassment; and,

  j.  other damages as will be shown through discovery and at trial.

118. The Plaintiff is therefore informed and believes that she is entitled to judgment against the Defendants for actual and punitive damages.

WHEREFORE, having fully set forth the grounds in her Complaint, Plaintiff asks the Court to award the following:

  1.  Compensatory and punitive damages in an appropriate amount against the Defendants, jointly and severally;

  2.  Statutory damages;

  3.  Attorney's fees and costs;

  4.  Such other and further relief as the Court may deem just and proper.

  5.  Respectfully submitted,

*(signature on following page)*

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553

October 24, 2017                          /s/Kyle J. White_____
                                          Druanne D. White (S.C. Bar No. 5991)
                                          Kyle J. White, (S.C. Bar No. 101426)
                                          White, Davis, and White Law Firm
                                          209 E. Calhoun St.
                                          Anderson, SC 29621
                                          (864) 231-8090
                                          druanne@wdwlawfirm.com
                                          kyle@wdwlawfirm.com


                                          Attorneys for the Plaintiff



                                          Lauren Taylor (S.C. Bar No. 100417)
                                          Lauren Taylor Law
                                          1205 E Washington St.
                                          Greenville, SC 29601

                                          Attorney for the Plaintiff



The Plaintiff demands a trial by jury.

/s/ Kyle J. White_____
Kyle J. White (SC Bar No. 101426)

42

**VERIFICATION**

Personally appeared before me, Savanah Nabors, who being duly sworn, deposes and says that she is the Plaintiff in the foregoing action, that she has read the within Amended Complaint, and hereby certifies that the facts are true of her own knowledge, except any matters and things therein alleged upon information and belief, and as to those, she believes them to be true.



_____
Savanah Nabors

SWORN TO BEFORE ME

This, the 24 of October, 2017

_____

Notary Public for the State of _FL_

My Commission Expires on _Jan. 15, 2020_



ROSWITHA KLEBER
Notary Public, State of Florida
Commission# FF 931791
My comm. expires Jan. 15, 2020

ELECTRONICALLY FILED - 2017 Oct 24 3:04 PM - GREENVILLE - COMMON PLEAS - CASE#2017CP2306553